603 So.2d 538 (1992)
In re Matter of Patricia DUBREUIL.
No. 90-1295.
District Court of Appeal of Florida, Fourth District.
July 8, 1992.
*539 Lonworth Butler, Jr., Fort Lauderdale, for appellant-Patricia Dubreuil.
Clarke Walden, Hollywood, for appellee-South Broward Hospital District.
STONE, Judge.
We affirm a trial court order authorizing a hospital and attending physicians to perform blood transfusions on the appellant, Patricia Dubreuil, notwithstanding that appellant, a Jehovah's Witness, refused such transfusions. It is undisputed that the transfusions were required in order to save her life. The appellant claims that the order violates her rights of privacy and religious freedom.
The appellant was admitted to Memorial Hospital late on a Thursday evening. She was in an advanced state of pregnancy and ready for immediate delivery. Her condition required that the delivery be done by cesarean section. She did not have a private physician. Although Mrs. Dubreuil signed routine admission forms authorizing the infusion of blood, she informed the doctor that she objected to the transfusions, rejecting her earlier signed consent. The appellant's mother, also a member of Jehovah's Witnesses, was present and supported her decision.
The cesarean section was performed and a healthy baby was born. However, the appellant suffers from a severe blood condition which prevents her blood from clotting properly. Due to uncontrolled bleeding, she lost large quantities of blood. As a result, transfusions became necessary to save her life.
The appellant and her husband, Luc Dubreuil, were separated and did not live together. Mr. Dubreuil is the natural father of their four minor children, ages 12, 6, 4 and the newborn child, only hours old at the time of the events in question. He did not accompany her to the hospital. The hospital contacted the local police who located him. Mr. Dubreuil, who is not a member of the Jehovah's Witnesses, signed consent forms for blood transfusions. Acting on that consent, the hospital performed a blood transfusion upon Mrs. Dubreuil prior to the court hearing. Also, Mrs. Dubreuil's two brothers came to the hospital and expressed their belief that a blood transfusion should be performed. Shortly thereafter, the appellant's spiritual adviser came to the hospital and emphasized that injecting blood into her body was objectionable.
The hospital then petitioned the circuit court for an emergency declaratory judgment to determine its authority to administer additional blood to appellant. The emergency hearing was conducted at approximately 3:00 p.m. Friday. Mrs. Dubreuil's attorney and the hospital district's counsel were present. There was not enough time to appoint a guardian ad litem for appellant or the children, or to secure sworn testimony. The matter was submitted to the trial court on stipulated facts. During the course of the hearing, counsel for the hospital district received a phone call and the court was advised that the *540 appellant, who had been unconscious, regained consciousness for a time and had again stated that she did not consent to receiving blood. At another point in the hearing, the court spoke with her physicians by a conference call.
The court was willing to hold a hearing at the hospital, but all parties and the court determined that such an adjournment would serve no purpose because Mrs. Dubreuil, but for the above limited communication, was in an unconscious state during most of the day and remained at that time unconscious. No evidence was submitted to the court concerning the fate of the four children in the event of the mother's death.
The court issued an order authorizing the hospital to administer transfusions as deemed necessary by Mrs. Dubreuil's attending physicians. As a result of the court's order, blood was immediately transfused into Mrs. Dubreuil and she survived. Her survival did away with any urgency in issuing this opinion, but does not mean that this case is moot, because the circumstances are capable of repetition, and should therefore not evade review. See Wons v. Public Health Trust of Dade County, 500 So.2d 679 (Fla. 3d DCA 1987), decision approved by 541 So.2d 96 (Fla. 1989).
The trial court recognized that the controlling authority governing the issues in this case is Public Health Trust of Dade County v. Wons, 541 So.2d 96 (Fla. 1989), the leading case in Florida regarding blood transfusions in the face of religious objection.
In Wons, the supreme court approved the trial court's refusal to order a blood transfusion where it was shown that the mother, by refusing the transfusion, was not abandoning her minor children. However, as the trial court here recognized, the supreme court in Wons also determined that each case of this nature requires individual attention. Here, the trial court concluded that the circumstances of this case substantially differed from those in Wons, as here Mrs. Dubreuil was separated from her husband and no testimony was presented regarding who would care for the four minor children in the event of her death. Therefore, in the absence of some suggestion or showing as to the availability of proper care for the minor children, the court held that the state's interests in the preservation of innocent third parties, Mrs. Dubreuil's four minor children, outweighed the wishes of Mrs. Dubreuil.
We see no reason to re-address in this opinion those matters covered by the supreme court and the Third District in their respective Wons opinions. However, we agree with the conclusion of the trial court that the factual support for those opinions relies upon the evidence and findings that the surviving Wons children, both teenagers, would be cared for by their father and the balance of the surviving family. We note that Justice Ehrlich's concurring opinion in Wons further emphasizes that in Wons there was no abandonment of the children, thereby negating any claim of an overriding state interest with respect to protecting the surviving children.
The supreme court in Wons recognized that the right to refuse medical treatment must be analyzed in terms of the principles enunciated in Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980), affirming and adopting the reasoning of this court in 362 So.2d 160 (Fla. 4th DCA 1978). Perlmutter recognized that a right to refuse life saving treatment will be overridden by a compelling state interest. The protection of innocent third parties is one such interest. Id. Here, those innocents are the children. See also St. Mary's Hosp. v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985).
In this case, the essential issue to be resolved by the trial court was whether the possible "abandonment" of the Dubreuils' children was an overriding state interest. Unfortunately, in this case, unlike Wons, no reliable evidence was available to assist the trial court in making this determination. No testimony was presented, and no suggestion was made to the court, as to who would care for Mrs. Dubreuil's four minor children in the event of her death, except that it was a known fact that Mr. *541 and Mrs. Dubreuil were separated to the point where he did not accompany her to the hospital. There was no evidence that either Mr. Dubreuil or Mrs. Dubreuil's family was able, capable, or suitable to care for the older child, let alone the young ones and the infant.
The trial court found that, "in the absence of some suggestion or showing as to the availability of proper care and custody of the four minor children[] in the event of the death of Patricia Dubreuil[,] this court believes that the demands of the state (and society) outweigh the wishes of Patricia Dubreuil[,] and that every medical effort should be made to prolong her life...."
Although the supreme court in Wons indicated that the burden is on the hospital to demonstrate abandonment, the court did not specifically address the dilemma, inherent in most such cases, that the "state" is not a party. This increases the heavy burden upon the court. We do not interpret Wons as placing an insurmountable or unreasonable burden of proof in the way of the court's responsibility to exercise its discretion, particularly given the emergency circumstances and the need for an immediate decision. Here, the trial court was presented with limited information, and the judge did not have the benefit of taking evidence from the patient or the estranged father and family with respect to the overriding issue of abandonment and the prospects of care for the children in the event that the mother's decision should be honored. Nevertheless, we can discern no reason to conclude that the hospital has not met its burden. We see no basis to hold that in the absence of first hand evidence to the contrary there is some presumption against a finding of abandonment. If anything, the presumption here should be to the contrary, given the ages of the children and the preexisting custody conditions. Additionally, it should be recognized that in many instances, the hospital's agents will understandably be primarily interested in protecting the hospital's interests, and may not represent all of the factors recognized in Wons.[1]
Here, nothing at all is known about the father or his ability to care for the children. The record only shows that the Dubreuils were separated, the children were in their mother's care and custody, the father did not accompany the mother to the hospital and he was contacted, apparently not at her request, only after the emergency arose. There is also evidence that the wife has a family but, similarly, the record is blank as to their ability or willingness to help out. The simple fact is that the trial court had no indication at the time of the crucial decision concerning what would happen to the children if their mother died.
We must assume that the emphasis placed by the supreme court in Wons on the facts of the case concerning the family support was significant to the outcome. There is no other explanation for the supreme court's treatment of those facts. We cannot say that the trial court abused its discretion in concluding on this record that there was an overriding interest in the state as parens patriae that out-balances the mother's free exercise and privacy right to reject the transfusion.
We additionally note that the trial court's order also mentions, in distinguishing Wons, that in this case the husband was not a member of Jehovah's Witnesses and did not support his wife's decision to refuse a blood transfusion. In so commenting the trial court was cognizant that both the appellate court and the supreme court in Wons had considered relevant the evidence of the husband's support for his wife's decision. However, we do not construe this comment by the trial court as indicating that the court believed that Mrs. Dubreuil's constitutional right to refuse treatment was in any way dependent upon the consent of her husband. Obviously a spouse's concurrence in such a decision is irrelevant to the exercise of a first amendment or privacy right, taken alone. Rather, *542 it is relevant only for the purpose of considering whether alternative care for the surviving children is available, in weighing the overriding interest of the state, and in determining whether or not the spouse's decision to refuse the transfusion constitutes an abandonment. That being the case, there is no reason to address the issue further. We also note that the issue in this case did not involve the additional considerations that are present where it is necessary to perform a blood transfusion in order to save the life of a fetus as well as the mother.
We conclude that since there was no showing that the children of tender years would be protected in the event of their parent's death, the trial court did not abuse its discretion.
AFFIRMED.
DELL, J., concurs.
WARNER, J., dissents with opinion.
WARNER, Judge, dissenting with opinion.
I dissent from the majority and address both issues raised in the briefs.

I. Spouse's Right to Control Treatment of Competent Spouse
The first issue presented involves whether or not Mrs. Dubreuil's right to refuse treatment is in any way dependent upon the consent of her husband. In other words, can either the hospital or the trial court compel treatment to the patient upon the consent of the spouse where the competent patient has refused? The hospital has ignored this issue in its brief. However, the hospital relied on the husband's consent to administer blood to Mrs. Dubreuil over her objection. Furthermore, in ordering blood transfusions the trial court placed emphasis upon the husband's lack of support for Mrs. Dubreuil's refusal to allow transfusions.
The Supreme Court held in In re Guardianship of Browning, 568 So.2d 4 (Fla. 1990) that "a competent person has the constitutional right to choose or refuse medical treatment, and that right extends to all relevant decisions concerning one's health." Id. at 11. This right is rooted in fundamental notions of the right of privacy. See Fla. Const.Art. I, § 23. Even before Florida's written constitutional provision was adopted, Justice Benjamin Cardozo noted, "Every human being of adult years and sound mind has a right to determine what shall be done with his own body." Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914). The right belongs to the individual, not the individual's spouse or family. As the Second District said in In re Browning, "One does not exercise another's right of self-determination or fulfill that person's right of privacy by making a decision which the state, the family, or public opinion would prefer." Id. 543 So.2d 258, 259 (Fla. 2d DCA 1989). Further, in exercising a treatment choice where a patient cannot express her decisions herself, our courts have adopted a "substituted judgment" approach. That is, the person called on to make treatment decisions for an adult must in all cases make the decision which the patient would make. See also In re A.C., 573 A.2d 1235 (D.C. 1990).
In this day and age where we have long since abandoned the notion that a wife is the husband's "property," I would think that it would be universally recognized that he cannot overrule her conscious decisions regarding care of her own body. I would hold that one spouse does not have the right to overrule the competent decisions of the other spouse regarding the spouse's own medical treatment. See also Nishi v. Hartwell, 52 Haw. 188, 198-99, 473 P.2d 116, 122 (1970); Reiser v. Lohner, 641 P.2d 93, 99 (Utah 1982); Beck v. Lovell, 361 So.2d 245, 250 (La. Ct. App. 1978); Murray v. Vandevander, 522 P.2d 302, 303 (Okla. Ct. App. 1974); Jeffcoat v. Phillips, 417 S.W.2d 903, 907 (Tex.Civ.App. 1967). The hospital had no right to rely on the consent of the husband when it was contrary to the conscious decision of Mrs. Dubreuil not to accept blood.

II. Does the state have a compelling interest which can override Mrs. Dubreuil's constitutional rights?
The general principles governing the issues in this case are found in Public *543 Health Trust v. Wons, 541 So.2d 96 (Fla. 1989) and Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980), aff'g 362 So.2d 160 (Fla. 4th DCA 1978) which held that a competent adult's decision to refuse lifesaving treatment may be overridden by a compelling state interest. The four identified factors which may show a compelling interest in a given case are:
1. Preservation of life;
2. Protection of innocent third parties;
3. Prevention of suicide; or
4. Maintenance of the ethical integrity of the medical profession.
In St. Mary's Hosp. v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985), this court held that the preservation of life in and of itself, however laudable, cannot be a compelling reason to deprive an individual of the right of privacy and the right to exercise deeply-held religious beliefs. To the same effect is Public Health Trust v. Wons. Similarly, St. Mary's discussion of the prevention of suicide and the maintenance of the ethical integrity of the medical profession show that these do not rise to a compelling state interest overriding a competent adult's decision to refuse lifesaving treatment. See also Satz v. Perlmutter, 379 So.2d 359.
What remains is whether the state has a compelling interest to preserve the life of Mrs. Dubreuil for the benefit of her minor children sufficient to override her competent decision to refuse lifesaving treatment. This is also the issue addressed in Wons. In Wons the Florida Supreme Court held that the state's interest in maintaining a home with two parents for the minor children did not override Mrs. Wons' constitutional rights of privacy and religion. The court's decision was predicated in part on the finding that the minor children would not be abandoned by the death of their mother where they had a supportive father and grandparents to tend to them. In a footnote to his concurring opinion, Justice Ehrlich commented that the court was not deciding whether abandonment alone would be sufficient in itself to override the competent patient's constitutional rights. Wons, 541 So.2d at 99 n. 2. In the instant case we cannot avoid readdressing the question of abandonment.
One of the earliest expressions of the idea that the state has a compelling interest in protecting a child from abandonment by a parent who refuses lifesaving medical treatment is the oft cited case of Application of President and Directors of Georgetown College, Inc., 331 F.2d 1000 (U.S.D.C.), reh. den., 331 F.2d 1010 (U.S.D.C. 1964). An analysis of this case shows not only that it is factually distinguishable, but it serves as scant authority for the proposition espoused. Young Mrs. Jones, the mother of a seven month old child, was brought to the hospital by her husband, having lost vast quantities of blood due to a ruptured ulcer. When it was apparent that Mrs. Jones would die without a blood transfusion, the husband refused on religious grounds, both husband and wife being members of the Jehovah's Witnesses. The hospital petitioned the Federal District Court for an order authorizing a transfusion, which the District Court denied. The hospital then petitioned one judge of the Circuit Court of Appeal who appeared at the hospital and conversed both with the husband and Mrs. Jones. He noted that Mrs. Jones was in no mental condition to make a decision concerning such a life and death matter. On the basis of his own evidentiary hearing, the one appellate judge ordered the transfusion and issued an opinion which has to this date been cited as authority in a host of other cases. His colleagues were less impressed and denied a petition for rehearing en banc, five of the nine judges expressing opinions that the matter was moot or that the procedural posture was so inherently flawed, being an order of only one judge of the court, as to be incapable of further review.
However, Chief Justice (then Judge) Warren Burger, joined by two other judges wrote that the petition should have been dismissed in that the hospital had no economic right or moral obligation which might be elevated to the status of a "dutyright" which presented a justiciable issue for the courts. Burger advocated the doctrine of judicial restraint when dealing with *544 such issues, noting that "we cannot neatly divide all of life's problems and decisions into three compartments and assign one to each of the three great branches of government." Id. at 1016. Quoting from Justice Brandeis' dissenting opinion in Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) that "[t]he makers of our constitution sought to protect Americans in their beliefs, their thoughts, their emotions, and their sensations," Burger noted that "nothing in this utterance suggests that Justice Brandeis thought an individual possessed these rights only as to sensible beliefs, valid thoughts, reasonable emotions, or well-founded sensations." Id. at 1017. Burger concluded that in issues such as refusing medical treatment, courts should exercise restraint in light of the absolute nature of judicial power, and that courts must "reconcile ourselves to the idea that there are myriads of problems and troubles which judges are powerless to solve... ." I think Chief Justice Burger would deem this case as one of those dilemmas.
Leaving aside the unusual posture of the Georgetown College case, the facts are considerably distinguishable. Unlike the present controversy, the judge found that Mrs. Jones was not in a mental condition to make a competent decision. Thus, the decision of her husband to refuse a transfusion on her behalf was not valid and was more akin to the line of cases precluding the parents of a minor child from refusing lifesaving treatment to the child because of their religious beliefs. Thus, despite its wide citation, it presents little precedential or analytical authority.
I have searched the reported authority and have found no case where an appellate court has upheld an order compelling a transfusion for a nonpregnant adult who has expressed a conscious and competent decision to refuse such a transfusion where the lower court's justification for ordering the transfusion has been on the sole ground that the protection of the adult's minor children overrides the adult's right to refuse. The cases cited by appellee are not factually similar. In Raleigh FitkinPaul Morgan Memorial Hosp. v. Anderson, 42 N.J. 421, 201 A.2d 537 (1964) the court ordered a blood transfusion to a pregnant woman on the ground that it was necessary for the protection of the unborn child. Accord Jefferson v. Griffin Spaulding County Hosp. Auth., 247 Ga. 86, 274 S.E.2d 457 (1981); Crouse Irving Memorial Hosp., Inc. v. Paddock, 127 Misc.2d 101, 485 N.Y.S.2d 443 (N.Y. Sup. Ct. 1985). Clearly, such cases involve the destruction of potential life and raise different questions than do the facts here. Instead, the question here is not the protection of life itself but of a certain quality of life for the minor children.
All of the decisions upholding the right to refuse blood transfusions in cases where the patient has minor children were situations involving two parents, with the husband supporting the wife's decision to refuse medical care. See Wons. See also Norwood Hosp. v. Munoz, 409 Mass. 116, 564 N.E.2d 1017 (1991); Fosmire v. Nicoleau, 75 N.Y.2d 218, 551 N.E.2d 77 (1990); In the Matter of Farrell, 108 N.J. 335, 529 A.2d 404 (1987); In re Osborne, 294 A.2d 372 (D.C.Ct. of App. 1972). Of the foregoing decisions, only Norwood Hosp. and Fosmire involve very young children.
In Fosmire, the New York court held that the existence of the patient's minor children did not amount to a superior interest for the State to interfere in the patient's decision to refuse a blood transfusion. Noting that the concept which developed from the Georgetown case was that by refusing the blood transfusion the patient was in effect abandoning her child, an act which the state could prevent, the court concluded that this view of abandonment went far beyond what the law had heretofore recognized and in fact would conflict with other legal principles:
Although the State will not permit a parent to abandon a child, the State has never gone so far as to intervene in every personal decision a parent makes which may jeopardize the family unit or the parental relationship. The laws of adoption and divorce show that the State recognizes competing interests and, in some instances, accords them priority. *545 ... Thus the State's concern with maintaining family unity and parental ties is not an interest which it enforces at the expense of all personal rights or conflicting interests.
The State's interest in promoting the freedom of its citizens generally applies to parents. The State does not prohibit parents from engaging in dangerous activities because there is a risk that their children will be left orphans... . There is no indication that the State would take a more intrusive role when the risk the parent has assumed involves a very personal choice regarding medical care.
Id. at 83-84. Similarly in Florida the state does not prefer parental ties over all other rights and conflicting interests. To the contrary, the adoption laws of this state allow the natural parent to voluntarily give his or her child up for adoption, which is in fact more of a "voluntary" abandonment than the refusal of treatment which occurs in this case. Further, the laws regarding dependency include a definition of "abandonment" which provides that the person responsible for the child's welfare, while being able, makes no provision for the child's support. In J.V. v. State, 516 So.2d 1133 (Fla. 1st DCA 1987), the court held that the parents' action in depriving their child of necessary medical treatment motivated by sincere religious beliefs was not "abandonment" or "neglect" within the statutory definitions. If that be the case, how then can the religiously motivated refusal of medical treatment by the parent for herself be considered "abandonment" of her children sufficient for the state to override her competent decision?
Furthermore, the state's response to child abandonment is not to force the parent to assume care of the child. Indeed, quite the opposite is true. As one commentator noted:
[s]tates do not ordinarily force individuals to fulfill their obligations; rather states force individuals to suffer the legal consequences of non-fulfillment. The state does not escort a parent to work to ensure child support; how, then, can a court justify forcing an unwilling patient to stay alive in order to achieve the same goal?
Note, The Refusal of Life-Saving Medical Treatment vs. The State's Interest in the Preservation of Life: A Clarification of the Interests at Stake, 58 Wash.U.L.Q. 85, 102 (1980) (footnotes omitted.)
The hospital contends that the husband is not supportive of the decision and that there is no evidence that he will assume his duty to care for the children. Therefore, it argues that the court was correct in concluding that in the absence of any suggestion as to the means or methods of caring for the children should Mrs. Dubreuil die, the demands of the state outweigh the rights of Mrs. Dubreuil. I disagree both as a matter of law and on the issue of the proper allocation of the burden of proof.
Both parents are the natural guardians of their children. Whether he was prepared or willing to accept custody, in the event of Mrs. Dubreuil's untimely death for any reason, Mr. Dubreuil would be the children's natural guardian, and would be legally responsible for arranging for their care. § 744.301, Fla. Stat. (1989). Therefore, from the standpoint of the state's interest in protecting the children from abandonment, their father as a matter of law will be responsible for their care.
The trial court placed on Mrs. Dubreuil the burden of proving that the minor children will be cared for in the event of Mrs. Dubreuil's death. However, where the state seeks to override the right of privacy based upon a compelling state interest, the burden is on the state to show that the proposed intrusion on the right of privacy is justified by a compelling state interest and that the state has used the least intrusive means in accomplishing its goal. Shaktman v. State, 553 So.2d 148 (Fla. 1989). Thus, it is the state's burden to prove that Mrs. Dubreuil's children will be abandoned. Simply to allow the state to prove its right to compel a blood transfusion in violation of the mother's right of privacy and right to her religious belief solely on the ground that she is a separated or divorced parent of minor children does not satisfy the heavy burden of proof the *546 state is required to bear in intruding on the right of privacy.
In Norwood Hospital, the Massachusetts court, citing Wons, held that "in the absence of any compelling evidence that the child will be abandoned, the State's interest in protecting the well-being of children does not outweigh the right of a fully competent adult to refuse medical treatment." Norwood Hospital, 564 N.E.2d at 1024. In that case, Mr. Munoz, while of advanced age, supported his wife's decision to refuse the blood transfusion, as did Mrs. Munoz' sister and brother-in-law. In a footnote, the court commented on the trial judge's finding that no evidence was presented to show a plan for caring for the minor child as follows:
The evidentiary hearing, however, was held only twenty-four hours after the hospital requested the declaratory judgment. It is not surprising, therefore, that the family had not formulated a `concrete plan'. We think it is sufficient that at the time the evidentiary hearing was held, there were family members who supported the patient's decision to forgo the medical treatment, and who were willing to assist in taking care of the child in the event that the patient died.
Id., 564 N.E.2d at 1025, n. 10. In this case there was no testimony taken. There were representations that the mother, spiritual advisor and friends supported the decision of Mrs. Dubreuil.[2] In such an emergency, which could not have been anticipated by Mrs. Dubreuil who was unable to participate in the court proceeding, it was error to shift to her the burden of proving, in detail, how her children would be cared for, making it impossible for her to vindicate her rights of privacy and religious freedom. I prefer the approach of both Wons and Norwood Hospital that in the absence of compelling evidence of abandonment, the state's interest in protecting the well-being of minor children does not outweigh the right of a competent adult to refuse lifesaving treatment. Here, there was no evidence which would show that the children would be abandoned. They had a father, supportive grandmother, and a supportive church. Furthermore, the very existence of persons in whose care the children may be placed showed that there were alternative, less intrusive means of accomplishing the state's goal of protecting the children from abandonment so that Mrs. Dubreuil's right of privacy and religious freedom were not required to be invaded.
To avoid the burden of proof problem the majority creates a presumption of abandonment of the children which now must be overcome by the patient in order to vindicate her right to exercise her competent decisions to refuse lifesaving treatment. That is contrary to the teaching of Wons which states:
The Health Trust expressed concern during oral argument that in future cases of this nature, the inconvenience of taking each treatment refusal case to court for an emergency judicial hearing would create problems. The Health Trust complains that this would present too heavy a burden on the hospitals to provide care between court appearances. While we understand the Health Trust's dilemma, these cases demand individual attention. No blanket rule is feasible which could sufficiently cover all occasions in which this situation will arise. Thus, it will be necessary for hospitals that wish to contest a patient's refusal of treatment to commence court proceedings and sustain the heavy burden of proof that the state's interest outweighs the patient's constitutional rights.
Id., 541 So.2d at 98. The supreme court recognized the dilemma that hospitals would face, and thus judges, too, but it emphatically placed upon the hospitals, not the patient, the requirement to sustain the burden of proof.
*547 I believe the majority's approach also diverges from In re Guardianship of Browning. There, the supreme court held that "a competent person has the constitutional right to choose or refuse medical treatment, and that right extends to all relevant decisions concerning one's health." Id. at 11. By a footnote the court made clear that it would not qualify that right based upon a designation of a medical procedure as major or minor. Id. at 11, n. 6. Thus, this extinguishes the belief of some that the state has a greater ability to order care when the procedure, such as a blood transfusion, is minor and relatively free of risk and will immediately restore life.[3] In discussing any intrusion by the state upon the right of privacy for a compelling state interest, the court recognized the compelling state interest identified in Wons and its antecedent authority but reiterated:
As we noted in Wons, the state interests discussed above are "by no means a bright line test, capable of resolving every dispute regarding the refusal of medical treatment. Rather they are intended merely as factors to be considered while reaching the difficult decision of when a compelling state interest may override the basic constitutional right[] of privacy." Wons, 541 So.2d at 97 [footnote omitted].
Id. at 14. I think the creation of the presumption of abandonment where a separated parent of minor children wishes to forego lifesaving treatment creates a bright line test rejected in Wons.
Both the majority opinion and my dissent focus on procedure (the burden or proof) rather than substance. To some, that may seem a convenient way to avoid a discussion of the underlying clash of individual rights versus society's expectations. However, that is not the case, as the standard for review is of paramount importance to the vitality of the privacy clause. As Judge Gerald Cope, Jr., foresaw in his writings on the privacy clause:
The most important single issue in the interpretation of the proposed privacy right is a technical one: what standard of review will be applied by Florida courts in construing it? All else depends on the answer to this question. If the Florida Supreme Court adopts a strong standard of review, it will require close judicial scrutiny when individuals seek to protect their privacy from governmental action. It will shift the burden of persuasion to the government. Such a test would ensure a strong and viable right of privacy.
If, on the other hand, the Florida Supreme Court adopts a weak standard of review, or worse, no explicit standard at all, then the right of privacy will be just so much excess baggage in the Florida Constitution. A weak standard of review would mean that the assertion of virtually any governmental interest would override individual privacy rights. The failure to adopt an explicit standard of review would create ad hoc decisionmaking whereby individual judges would decide individual cases on their particular facts through an unarticulated balancing process.
Cope, To Be Let Alone: Florida's Proposed Right of Privacy, 6 Fla.St.U.L.Rev. 673, 744 (1978). The compelling state interest test was adopted specifically because it placed on the government the heavy burden of proof. Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla. 1985). By doing so it reaffirmed the fundamental nature of the individual's right of privacy. The supreme court has again reaffirmed "that this is a highly stringent standard, emphasized by the fact that no government intrusion in the personal decisionmaking cases [case citations omitted but including Wons] has survived." In re T.W., 551 So.2d 1186 (Fla. 1989). The adherence to such a standard insures that the right of privacy, and in this case religion, remain fundamental. It is my belief that the majority's analysis does not adhere to this stringent standard of review and thus lessens the vitality of the Right of Privacy clause contrary to Winfield, Wons, Shaktman, and In re T.W.
*548 This has indeed been a troubling case, both at the trial court level and at the appellate level. I am sure that the sentiments of Judge Wright who authored Application of President and Directors of Georgetown College were in the mind of the trial court as well as our minds:
The final, and compelling reason for granting the emergency writ was that life hung in the balance. There was no time for research and reflection. Death could have mooted the cause in a matter of minutes, if action were not taken to preserve the status quo. To refuse to act, only to find later that the law required action, was a risk I was unwilling to accept. I determined to act on the side of life.
Id. at 1009-1010. We have the luxury of research and reflection but it does not make the task any easier when facing life and death issues. However, the responsibility of the courts is to interpret and apply the constitutional principles at issue. There is nothing quite so sacred as one's view of religion. For Mrs. Dubreuil it resulted in a most difficult decision. In my view the Constitution calls for us to respect her sincere religious beliefs and her right of privacy to make those highly personal decisions. I would reverse.
NOTES
[1] Wons stated that four established factors to be considered in determining whether a compelling state interest overrides the right to refuse medical treatment are (1) the preservation of life, (2) the protection of innocent third parties, (3) the prevention of suicide, and (4) the maintenance of the ethical integrity of the medical profession. Wons, 541 So.2d at 97.
[2] Even if, as the majority suggests, the evidence was not before the court on the initial ruling, which I would dispute given the presence of the grandmother and the appellant's spiritual advisor at appellant's beside, appellant requested a rehearing and proffered evidence on the care of the children which the court denied. Given the abbreviated nature of the initial proceeding at which no evidence was taken, and the judge's order which was prospective in nature, the motion should have been granted.
[3] I acknowledge appellant's dispute as to the nature of a blood transfusion and its relative safety, including the possibility of obtaining infected blood.