629 So.2d 819 (1993)
In re Matter of Patricia DUBREUIL.
No. 80311.
Supreme Court of Florida.
November 4, 1993.
Rehearing Denied January 20, 1994.
*820 Cynthia L. Greene of the Law Offices of Elser, Greene & Hodor, Miami, and Donald T. Ridley, Brooklyn, NY, for petitioner.
Clarke Walden, Gen. Counsel, South Broward Hosp. Dist., Hollywood, and F. Philip Blank and William D. Anderson of Blank, Rigsby & Meenan, P.A., Tallahassee, for respondent.
William E. Hoey, Tequesta, amicus curiae for Watchtower Bible and Tract Soc. of New York, Inc.
Rebecca C. Morgan, Professor of Law, Stetson University College of Law, St. Petersburg, amicus curiae for American Civil Liberties Union Foundation of Florida, Inc.
BARKETT, Chief Judge.
We review In re Dubreuil, 603 So.2d 538 (Fla. 4th DCA 1992), which held that a married but separated woman who chose not to receive a blood transfusion for religious reasons could be compelled to receive medical treatment because her death would cause the abandonment of four minor children. We quash the district court's decision because there was no abandonment proved in this case to override the patient's constitutional rights.[1]

I. The Facts

The parties have agreed on the essential facts in this case. In the late evening of Thursday, April 5, 1990, Patricia Dubreuil was admitted to Memorial Hospital in Hollywood, Florida, through its emergency room.[2] Patricia was in an "advanced stage" of pregnancy. At the time of her admission, she did not have a private attending physician, so Memorial Hospital assigned an obstetrician from its staff to render necessary obstetrical services. Upon admission, Patricia signed a standard consent form agreeing to the infusion of blood if it were to become necessary.
By the early morning hours of April 6, physicians determined that Patricia was ready to deliver her child and that a Caesarean section delivery would be appropriate. She consented to the Caesarean section, but notwithstanding the routine consent form she had signed, she withheld consent to the transfusion of blood on the basis of her values and religious convictions as a Jehovah's Witness.[3] Michael Dubreuil was subsequently *821 delivered by Caesarean section at approximately 5:30 a.m. on April 6.
At the time of delivery Patricia experienced a significant loss of blood because of a severe blood condition that prevents her blood from clotting properly. Attending physicians determined that a blood transfusion was required to save her life, but Patricia still refused to consent. Because of the extreme medical emergency that existed on the morning of April 6, medical authorities, with police assistance, contacted Luc Dubreuil, Patricia's estranged husband. He had not accompanied Patricia when she went to the hospital hours earlier. When Luc arrived shortly thereafter, he consented to the blood transfusion. Physicians relied upon Luc's written consent and transfused a quantity of blood into Patricia during the morning of April 6.
Luc and Patricia were still married but were separated and living apart when this incident arose. They are the natural parents of the newborn infant, Michael, and three other minor children, Cary, Tina, and Tracy, who at the time, respectively, were twelve, six, and four years old and living with their mother. Luc was not a Jehovah's Witness. Luc's consent was supported by Patricia's two brothers, who were not Jehovah's Witnesses, while Patricia's mother, who is a Jehovah's Witness, backed her daughter's decision.
After the transfusion early on April 6, physicians apparently believed that transfusions would continue to be needed. Unsure of its legal obligations and responsibilities under these circumstances, the hospital petitioned the circuit court for an emergency declaratory judgment hearing to determine the hospital's authority or duty to administer blood transfusions to Patricia over her objections.[4] A hearing was scheduled for 3 p.m. on April 6. The parties do not know whether the trial court was aware that a transfusion had already been given at the time of the hearing, but they believe the trial court was aware that transfusions would continue to be needed throughout the day.
The trial court conducted the hearing as scheduled, attended by counsel representing Patricia and the hospital. No testimony was taken, but during the hearing the hospital's counsel received a telephone call advising that Patricia, who had been unconscious, had just become conscious, appeared lucid, and was able to communicate. When asked at that time whether she would consent to a blood transfusion, Patricia again refused.
At 3:30 p.m. on April 6, the trial court orally announced judgment in favor of the hospital, allowing it to administer blood as physicians deemed necessary. Subsequently, according to an affidavit later executed by Patricia, the hospital continued to administer blood, and Patricia survived.
The trial court issued a written order on April 11, concluding that
there has been no suggestion as to the means or methods of caring for the four minor children of Patricia Dubreuil, if she should die. In the absence of some suggestion or showing as to the availability of proper care and custody of the four minor children, in the event of the death of Patricia Dubreuil, this court believes that the demands of the state (and society) outweigh the wishes of Patricia Dubreuil and that every medical effort should be made to prolong her life so that she can care for her four minor children until their respective majorities.
In re Dubreuil, No. 90-10561(21), Order at 10 (Fla. 17th Cir.Ct., Apr. 11, 1990). Patricia moved for rehearing, indicating that she continued to object to blood transfusion and that she had an "extended family as well as friends who are willing to assist in the rearing of [her] minor children in the event of her demise." The Circuit Court denied rehearing on April 12. The Fourth District affirmed by a 2-1 vote.
Patricia sought discretionary review here, arguing that the decision below violates her state and federal constitutional rights of privacy, bodily self-determination, and religious freedom. We recognize that the present *822 case is moot given that Patricia received blood and was released from the hospital. However, we accept jurisdiction because the issue is one of great public importance, is capable of repetition, and otherwise might evade review. See In re Guardianship of Browning, 568 So.2d 4, 8 n. 1 (Fla. 1990); In re T.W., 551 So.2d 1186, 1189 (Fla. 1989); Holly v. Auld, 450 So.2d 217, 218 n. 1 (Fla. 1984); In re Dubreuil, 603 So.2d at 540; Wons v. Public Health Trust of Dade County, 500 So.2d 679, 684 (Fla. 3d DCA 1987), approved, 541 So.2d 96 (Fla. 1989).

II. The Rights of Privacy and Free Exercise of Religion

We begin our analysis with the overarching principle that article I, section 23 of the Florida Constitution guarantees that "a competent person has the constitutional right to choose or refuse medical treatment, and that right extends to all relevant decisions concerning one's health." In re Guardianship of Browning, 568 So.2d 4, 11 (Fla. 1990); see also In re T.W., 551 So.2d 1186 (Fla. 1989); Public Health Trust of Dade County v. Wons, 541 So.2d 96 (Fla. 1989). In cases like this one, the privacy right overlaps with the right to freely exercise one's religion to protect the right of a person to refuse a blood transfusion because of religious convictions. Art. I, §§ 3, 23, Fla. Const.; Wons.[5]
In cases where these rights are litigated, a party generally seeks to invoke the power of the State, through the exercise of the court's judicial power, either to enforce the patient's rights or to prevent the patient from exercising those rights. We have set forth the following guiding principles:
The state has a duty to assure that a person's wishes regarding medical treatment are respected. That obligation serves to protect the rights of the individual from intrusion by the state unless the state has a compelling interest great enough to override this constitutional right. The means to carry out any such compelling state interest must be narrowly tailored in the least intrusive manner possible to safeguard the rights of the individual.
Browning, 568 So.2d at 13-14 (footnote omitted); see also Wons, 541 So.2d at 96; In re T.W., 551 So.2d at 1192-93. Among the factors we have identified that could be considered in determining whether to give force to a patient's right to refrain from medical treatment is the protection of innocent third parties, see, e.g., Browning, 568 So.2d at 14, often discussed in terms of "abandonment." See, e.g., Wons, 541 So.2d at 97 (Ehrlich, C.J., concurring specially).[6]
The arguments made in this Court present two basic issues. First, we must determine whether it is appropriate for a hospital to assert the state interests in an attempt to defeat a patient's decision to forgo emergency medical treatment. Second, assuming the state interests were properly presented in this case, we must decide whether Patricia's rejection of a blood transfusion constituted, as the district court found, abandonment of the couple's minor children and amounted to a state interest that was compelling enough to override her constitutional rights of privacy and religious freedom, by the least intrusive means available.

III. Asserting the State Interests

Patricia argues that Memorial Hospital should not have intervened in her private decision to refuse a blood transfusion. She claims that the "State" has never been a party in this action, has not asserted any interest, and that the hospital has no authority to assume the State's responsibilities. The hospital argues in its brief that as a public health care facility owned and operated *823 by a special taxing district established under Florida law, it acted as a unit of local government and stood in the shoes of the State for the purposes of asserting the state interests. However, at oral argument, the hospital expressed substantial discomfort in assuming the role of the State in such proceedings. Consequently, both parties agreed that a procedure should be established by which the State can properly intervene if there is reason to do so.
In most prior Florida decisions where state interests were asserted under analogous medical emergency situations, the State Attorney joined as a party at some point in the proceedings. See In re Guardianship of Browning, 568 So.2d 4 (Fla. 1990); John F. Kennedy Memorial Hosp., Inc. v. Bludworth, 452 So.2d 921 (Fla. 1984); Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980); In re Guardianship of Barry, 445 So.2d 365 (Fla. 2d DCA 1984); St. Mary's Hosp. v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985).[7]
One noteworthy exception is Public Health Trust of Dade County v. Wons, 541 So.2d 96 (Fla. 1989), where, as in this case, the state interests were argued by a public health care provider without further intervention of the State. In discussing the need for court proceedings and the requisite burden of proof, we said "it will be necessary for hospitals that wish to contest a patient's refusal of treatment to commence court proceedings and sustain the heavy burden of proof that the state's interest outweighs the patient's constitutional rights." Id. at 98. We merely assumed, based on the facts in that case, that the health care provider would raise the state interests. Until today, we were not asked to determine whether it is appropriate for a health care provider, as opposed to another party, to assert the state interests in the first instance.
We conclude that a health care provider must not be forced into the awkward position of having to argue zealously against the wishes of its own patient, seeking deference to the wishes or interests of nonpatients  in this case Patricia's husband, her brothers, the children, and the State itself. Patients do not lose their right to make decisions affecting their lives simply by entering a health care facility. Despite concededly good intentions, a health care provider's function is to provide medical treatment in accordance with the patient's wishes and best interests, not as a "substitute parent" supervening the wishes of a competent adult. Accordingly, a health care provider must comply with the wishes of a patient to refuse medical treatment unless ordered to do otherwise by a court of competent jurisdiction. A health care provider cannot act on behalf of the State to assert the state interests in these circumstances. This is an appropriate role for the State to play directly, not through the legal artifice of a special taxing district.
"Additionally, it should be recognized that in many instances, the hospital's agents will understandably be primarily interested in protecting the hospital's interests, and may not represent all of the factors recognized in Wons." Dubreuil, 603 So.2d at 541. Moreover, placing the State's burden on the health care provider would be even more inappropriate where the health care provider is a private, rather than public, entity.
Therefore, we recede from Wons to the extent that it may be read to put any burden of proof on the health care provider with respect to asserting the state interests. That heavy burden must be borne directly by the State.
We recognize that in situations like these, health care providers generally have sought judicial intervention to determine their rights and obligations to avoid liability. In John F. Kennedy Memorial Hospital, Inc. v. Bludworth, 452 So.2d 921, 926 (Fla. 1984), we held that health care providers, when terminating life support in accordance with their patient's wishes, are relieved of potential civil and criminal liability as long as they act in good faith, and that no prior court approval of the health care provider's action is required. We believe the same principles apply here. When a health care provider, *824 acting in good faith, follows the wishes of a competent and informed patient to refuse medical treatment, the health care provider is acting appropriately and cannot be subjected to civil or criminal liability.
Although this procedure absolves the health care facility of any obligation to go to court, we recognize the need for the State and interested parties to have the opportunity to seek judicial intervention if appropriate. Accordingly, a health care provider wishing to override a patient's decision to refuse medical treatment must immediately provide notice to the State Attorney presiding in the circuit where the controversy arises, and to interested third parties known to the health care provider. The extent to which the State Attorney chooses to engage in a legal action, if any, is discretionary based on the law and facts of each case. This procedure should eliminate needless litigation by health care providers while honoring the patient's wishes and giving other interested parties the right to intervene if there is a good faith reason to do so. Cf. In re Guardianship of Browning, 568 So.2d 4, 16 (Fla. 1990) (courts are open to adjudicate legitimate questions pertaining to written or oral instructions expressing a patient's wishes).
Even though the State did not properly join this action, the hospital followed Wons and stood in the State's shoes, assuming the heavy burden of proving that the prevention of abandonment outweighed Patricia Dubreuil's constitutional right to refuse medical treatment. The court below accepted the hospital's argument and adjudicated the case on the merits. Accordingly, we address the merits of the district court's decision.

IV. Protecting Innocent Third Parties

The state interest raised in this case is the protection of innocent third parties, which the parties and courts in other jurisdictions under similar circumstances have termed the prevention of abandonment of minor children. Until Dubreuil, no other reported Florida appellate decision had found abandonment in this context. The case most closely on point in this Court's jurisprudence is Wons, where abandonment was discussed but not found.[8]
*825 Norma Wons, a 38-year-old woman, had been suffering from dysfunctional uterine bleeding, and physicians said she could die without a blood transfusion. However, she refused based on her religious convictions as a Jehovah's Witness. Norma lived with her husband Henrich and their two minor children, who were twelve and fourteen years of age. Henrich was also a Jehovah's Witness and supported Norma's decision. Henrich worked to support the family, and during Norma's illness the children had been cared for in Henrich's absence by Norma's sixty-two-year-old mother, who was in good health. Testimony established that if Norma were to die, her mother and two brothers, who also were Jehovah's Witnesses, would assist in taking care of the children. The trial court ruled that Norma's refusal would deny the children the intangible right to be reared by two loving parents, and the state interest in protecting the two minor children overrode Norma's right to refuse lifesaving medical treatment. The Third District reversed, finding that there was no showing of an abandonment of the minor children to override Norma's constitutional rights. The district court said that
the societal interest in protecting Mrs. Wons' two minor children as recognized in [Satz v. Perlmutter, 379 So.2d 359 (Fla. 1980), adopting 362 So.2d 160 (Fla. 4th DCA 1978) and St. Mary's Hospital v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985)]  although a vital and troubling consideration in this case  cannot, in our view, override Mrs. Wons' constitutional right to refuse a blood transfusion under the circumstances of this case. This is so because, simply put, Mrs. Wons' probable, but not certain, demise by refusing the subject blood transfusions will not result in an abandonment of her two minor children. According to the undisputed testimony below, she has a tightly knit family unit, all practicing Jehovah's Witnesses, all of whom fully support her decision to refuse a blood transfusion, all of whom will care for and rear the two minor children in the event she dies. Her husband will, plainly, continue supporting the two children with the aid of her two brothers; her mother, a sixty-two-year-old woman in good health, will also care for the children while her husband is at work. Without dispute, these children will not become wards of the state and will be reared by a loving family.
Wons, 500 So.2d at 688.
This Court generally approved the district court's rationale and held that the state interest *826 in maintaining a home with two parents for the minor children does not override a patient's constitutional rights of privacy and religion to refuse a potentially lifesaving blood transfusion. Wons, 541 So.2d at 98.
Significantly, as then-Chief Justice Ehrlich noted, there was no abandonment proved in that case, so the protection of innocent third parties could not have been a "compelling interest sufficient to override the competent patient's right to refuse treatment." Id. at 99 (Ehrlich, C.J., concurring specially). Because there was no abandonment in Wons, we did not decide in that case "whether evidence of abandonment alone would be sufficient in itself to override the competent patient's constitutional rights." Id. at 99 n. 2 (Ehrlich, C.J., concurring specially).
The trial court in Dubreuil found abandonment and held it to be an overriding state interest. The court distinguished Wons, noting that Luc no longer lived with Patricia and the children; Luc was not a Jehovah's Witness and consented to the transfusion; and Patricia presented no evidence of how the children would be cared for in the event of her death.
In a split decision, the district court affirmed by reasoning that Wons put the burden on the hospital to prove abandonment, and under the emergency circumstances and limited evidence presented, the hospital carried its burden. The district court focused on the fact that no evidence was presented about Luc, his ability to care for the couple's children, or the ability or willingness of any others to help care for the children in the event of Patricia's death. The court rejected the argument that a presumption against finding abandonment should exist in the absence of firsthand evidence to the contrary, suggesting that if any presumption were to apply, it would be a presumption in favor of finding abandonment given the ages of the children and the preexisting custody conditions.
The district court concluded that because there was no showing that the children of tender years would be protected in the event of their parent's death, the trial court did not abuse its discretion by concluding that "there was an overriding interest in the state as parens patriae that out-balances the mother's free exercise and privacy right to reject the transfusion." Dubreuil, 603 So.2d at 541.
In dissent, Judge Warner observed that Luc, as the natural father, is the children's legal guardian and is responsible for their care as a matter of Florida law under section 744.301, Florida Statutes (1991). Judge Warner relied on our decision in Wons to conclude that because the hospital failed to present compelling evidence that abandonment would result from the rejection of medical treatment, no compelling state interest was established to override Patricia's decision. 603 So.2d at 546.
In her argument to this Court, Patricia urges us to eliminate from this line of cases any consideration given to the state interest in protecting innocent third parties from abandonment, claiming that it is inherently unsound and dangerous and cannot be consistently applied. She argues, for example, that it will lead beyond blood transfusions to major medical procedures ranging from Caesarean sections to heart bypass surgery; or it will allow courts to compel a pregnant Catholic woman who is the single parent of a minor child to have an abortion against her religious beliefs if taking the pregnancy to term would endanger the mother's life. She also argues that the rule eventually will go well beyond the protection of minor children, compelling a single adult, who cares for her dependent elderly parent or grandparent, to receive unwanted medical treatment in order to advance the state interest in protecting the elderly dependent.
Patricia's argument has some merit. Parenthood, in and of itself, does not deprive one of living in accord with one's own beliefs. Society does not, for example, disparage or preclude one from performing an act of bravery resulting in the loss of that person's life simply because that person has parental responsibilities.[9]
*827 Nonetheless, we decline at this time to rule out the possibility that some case not yet before us may present a compelling interest to prevent abandonment.[10] Therefore, we think the better course is the one we took in Wons, where we held that "these cases demand individual attention" and cannot be covered by a blanket rule. Wons, 541 So.2d at 98.
Next, Patricia argues that even if the prevention of abandonment may be a valid state interest, there was no proof in this record that an abandonment would have occurred had Patricia died after refusing medical treatment. We agree.
Both the circuit and district courts failed to properly consider the father of the four children, Luc Dubreuil. Under Florida law, as Judge Warner's dissent correctly observed, a child with two living natural parents has two natural guardians who share equally the responsibilities of parenting. "If one parent dies, the natural guardianship shall pass to the surviving parent, and the right shall continue even though the surviving parent remarries. If the marriage between the parents is dissolved, the natural guardianship shall belong to the parent to whom the custody of the child is awarded." § 744.301(1), Fla. Stat. (1991). Thus, Florida law unambiguously presumes that had Patricia died under these circumstances, Luc would have become the sole legal guardian of the couple's four minor children and would have been given full responsibility for their care in the absence of any contravening legal agreement or order.[11]
The State could rebut this strong legal presumption only by presenting clear and convincing evidence that Luc would not properly assume responsibility for the children under the circumstances.[12]Cf. Padgett v. Department of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla. 1991) (parental rights may be permanently terminated under Florida law upon showing of clear and convincing evidence that parent abused, neglected, or abandoned a child). However, there was absolutely no such evidence presented in this case, as the record is silent as to Luc's ability or desire to care for the children. The record shows only that Luc and Patricia were married but separated, their minor children were under Patricia's care, Luc did not accompany his wife to the hospital, he was readily available when called to Patricia's bedside on the morning of April 6, and he was available to "consent"[13] to an emergency treatment for Patricia.
*828 Likewise, there was no evidence presented as to whether anyone else, including the families of Luc and Patricia, would take responsibility for the children. To the contrary, Patricia said in an affidavit on rehearing that extended family members and friends were willing to assist in raising the children in the event of Patricia's death.
Moreover, we do not know if Luc or any other interested party was given the opportunity to address these issues. According to the parties' stipulation, neither Luc nor any other family members attended the emergency hearing, and the record contains no evidence that notice of the hearing was provided. Cf. Fosmire v. Nicoleau, 75 N.Y.2d 218, 551 N.Y.S.2d 876, 879, 551 N.E.2d 77, 80 (N.Y. 1990) (trial court erred by signing ex parte order compelling blood transfusion without giving patient or her husband notice and the opportunity to be heard even though only three hours lapsed between making the application and signing of the order, and an additional six hours before the order was executed).
We conclude that the district court erred in holding that sufficient evidence was presented to satisfy the heavy burden required to override the patient's constitutional right to refuse medical treatment. The State alone bore that burden, which the hospital, standing in the State's shoes, did not carry.
Moreover, the district court erred by suggesting that absent firsthand proof, the law should presume abandonment under these circumstances. To the contrary, the law presumes that when one parent is no longer able to care for the couple's children, the other parent will do so. The district court's decision effectively presumed that Luc had abandoned his children when he separated from his wife. That presumption is unacceptable. The state cannot disparage a person's parental rights nor excuse a person's parental responsibilities based on martial status alone. See Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1972).
Likewise, although not intended by the district court, its rationale could be read by some to perpetuate the damaging stereotype that a mother's role is one of caregiver, and the father's role is that of an apathetic, irresponsible, or unfit parent. See, e.g., Sylvia A. Law, Rethinking Sex and the Constitution, 132 U.Pa.L.Rev. 955, 995-98 (1984); see also Frontiero v. Richardson, 411 U.S. 677, 685, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973) (recognizing that "gross, stereotyped distinctions between the sexes" in the law effectively discriminate against the rights of women). The law has evolved to move away from inappropriate gender-based distinctions. See, e.g., Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (holding unconstitutional a state statute that treated parental rights of unwed men and unwed women differently); Frontiero (holding unconstitutional a federal statute that treated husbands and wives of military service personnel differently). We do not want the district court's rationale misinterpreted to reinforce these outdated ideas in a manner that effectively denies a woman her constitutional right to refuse medical treatment as guaranteed by article I, sections 3 and 23 of the Florida Constitution. Such an interpretation would also undermine the principle of shared parental responsibility, to which this state adheres. § 61.13(2)(b), Fla. Stat. (1991); see, e.g., Mize v. Mize, 621 So.2d 417 (Fla. 1993).
For the foregoing reasons, we quash the district court's decision.
It is so ordered.
SHAW, GRIMES, KOGAN and HARDING, JJ., concur.
OVERTON, J., dissents with an opinion.
McDONALD, J., dissents with an opinion, in which OVERTON, J., concurs.
*829 OVERTON, Justice, dissenting.
I fully agree with the dissent of Justice McDonald. Further, in my view, this innocent newborn child should have some rights, particularly when (1) the mother sought the medical treatment and consented to the birth by Caesarean section; (2) the mother could be and was restored to full health in a short period of time after the birth and blood transfusion; and (3) the family disagreed as to whether the blood transfusion should be administered (Dubreuil's estranged husband and two brothers believed she should receive full medical treatment, while her mother agreed with her decision not to have the blood transfusion).
Clearly, a newborn does have a significant special need for his or her natural mother. The majority opinion, however, eliminated this need as a factor in this life-or-death-decision process. Further, and as important, the majority has effectively denied the State an opportunity to protect the interests of this newborn child and has effectively condoned child abandonment, if the mother's decision is made for religious reasons. I adhere to my dissent in Public Health Trust v. Wons, 541 So.2d 96 (Fla. 1989).
McDONALD, Justice, dissenting.
Admittedly, the courts travel in treacherous waters when they place any restrictions upon the free exercise of a person's religious beliefs. Such restriction should occur only when there is another compelling interest great enough to override this strong constitutional right. The trial judge found that the circumstances of this case meet this test. I agree with him.
There is no controversy or contest to the fact that unless Mrs. Dubreuil received blood transfusions she would die. The majority holds that this is a choice she can make if done in the exercise of her religious belief. The trial judge found, and I agree, that the children's right to have a mother outweighs the mother's right to observe her religious beliefs. Considering the age of these children, as opposed to the age of the children in Wons v. Public Health Trust, 541 So.2d 96 (Fla. 1989), this would be true whether Mr. Dubreuil faithfully performed all of his parental responsibilities or not.
Children of tender age desperately need the nurturing of a mother. Mrs. Dubreuil, according to all reports, is a fit and loving mother. It would be a legal mistake to let her expire because of the observance of her religious beliefs and leave these children motherless. I firmly place myself in the camp of In re President & Directors of Georgetown College, Inc., 331 F.2d 1000 (D.C. Cir.), cert. denied, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964), and In re Winthrop University Hospital, 128 Misc.2d 804, 490 N.Y.S.2d 996 (Sup.Ct. 1985). Children need, and are entitled to have, their mothers; this need is sufficiently great to outweigh one's free exercise of religious beliefs. The majority states: "Parenthood in and of itself does not deprive one of living in accord with one's own beliefs." Majority op. at 826. I suggest that parenthood, under some circumstances at least, can indeed deprive one of the right to live in accord with one's own beliefs. Parenthood requires many adjustments and often great sacrifice for the welfare of a person's children. Nearly every living creature of every species recognizes the duty to nurture its offspring. Their lives are changed in doing so. Humans should not allow religious beliefs, no matter how deeply seated or appropriately held, to neglect this fundamental duty. Mothers do not abandon the nest.
Were this less than a life or death decision, or involved adolescents as opposed to young children, I would feel less fervent. Under the facts here, a compelling interest great enough to override Mrs. Dubreuil's exercise of her religious beliefs or right of privacy clearly exists. I believe the majority makes a tragic mistake.
OVERTON, J., concurs.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(3) of the Florida Constitution to review the district court's express construction of the Florida Constitution.
[2] Memorial Hospital is a public health care facility owned and operated by the South Broward Hospital District, a special taxing district established under Florida law.
[3] Neither party has suggested that Patricia was incapacitated when she withheld her consent to the transfusion, nor do the parties question that her refusal of treatment was unambiguous despite her earlier written consent.
[4] The Petition was filed in the circuit court by the South Broward Hospital District on behalf of the hospital, and the District is the Respondent in the action in this Court. For clarity, we refer to Respondent as the hospital throughout this opinion.
[5] We adhere to the doctrine of primacy enunciated in Traylor v. State, 596 So.2d 957, 962-63 (Fla. 1992), deciding this case under express provisions of the state constitution rather than the federal constitution.
[6] Although we have recognized other state interests that may be considered, see Browning, 568 So.2d at 14; Wons, 541 So.2d at 97, only the protection of innocent third parties has been argued in this case, and that issue was dispositive in the decision below. Moreover, as we previously have stated, these state interests are merely factors to consider and "are `by no means a bright-line test, capable of resolving every dispute regarding the refusal of medical treatment.'" Browning, 568 So.2d at 14 (quoting Wons, 541 So.2d at 97).
[7] Because the State's participation was not an issue in those cases, the opinions generally do not say how or when the State intervened.
[8] Perhaps the closest Florida appellate decision is St. Mary's Hospital v. Ramsey, 465 So.2d 666 (Fla. 4th DCA 1985). There, a 27-year-old divorced man was deemed not to have abandoned his minor daughter when he refused a transfusion upon evidence that (1) the daughter's primary residence was in Michigan with Ramsey's former wife, and as a result the father seldom saw the child; (2) the mother and both families pledged their help to support the child; and (3) Ramsey owned a small annuity that named the child as a beneficiary.

Appellate courts in other jurisdictions have looked at abandonment in the general context of a parent refusing medical treatment, and most have found no abandonment. In Fosmire v. Nicoleau, 75 N.Y.2d 218, 551 N.Y.S.2d 876, 551 N.E.2d 77 (N.Y. 1990), Denise Nicoleau refused a blood transfusion after hemorrhaging when she gave birth prematurely by Caesarean section. She and her husband were Jehovah's Witnesses, and she made her intention to refuse treatment clear. The court held that an asserted state interest in preventing a parent from intentionally abandoning a child did not outweigh the patient's statutory and common law right to refuse medical treatment. The court's analysis focused exclusively on the nature of the rights and interests at issue, and did not include any reference to whether there was evidence of the circumstances of the father or extended family. In Norwood Hospital v. Munoz, 409 Mass. 116, 564 N.E.2d 1017, 1024-25 (1991), the court followed Wons to conclude that "the State does not have an interest in maintaining a two-parent household in the absence of compelling evidence that the child will be abandoned if he is left under the care of a one-parent household." 564 N.E.2d at 1025. The court found no compelling interest in protecting the minor child of Yolanda and Ernesto Munoz when Yolanda refused on religious grounds to receive a blood transfusion because there was no evidence that the father, who supported his wife's decision, was unwilling to take care of the child, although there was no plan to take care of the youth in Yolanda's absence; Ernesto had financial resources to take care of the child; and Ernesto's sister and brother-in-law, who supported Yolanda's decision, said they would assist in caring for the child. See also In re Farrell, 108 N.J. 335, 529 A.2d 404 (1987) (woman suffering from debilitating disease had right to terminate life support even though she would leave behind husband and two teenage children where they had a close loving family, she had expressed concern for their welfare, and guardian ad litem believed the children would not be harmed); In re Osborne, 294 A.2d 372 (D.C. 1972) (approving trial court's refusal to appoint a guardian to consent to blood transfusion for father of two minor children where both patient and wife were Jehovah's Witnesses, the family had sufficient financial resources to meet the children's material needs, and the extended family was prepared to help care for the children).
Two cases that we know of have found abandonment. In Application of the President & Directors of Georgetown College, Inc., 331 F.2d 1000 (D.C. Cir.) (one-judge decision), rehearing en banc denied with opinions, 331 F.2d 1010 (D.C. Cir.), cert. denied, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964), a Jehovah's Witness, who was the mother of seven-month-old child, was "in extremis." Although physicians believed she needed a transfusion, both she and her husband refused to consent on religious grounds. The hospital asked the federal district court to permit it to administer blood, but the court denied the petition. The hospital then "appealed" that decision to a single member of the United States Circuit Court, Judge J. Skelly Wright. Judge Wright went to the hospital and spoke to the patient, but she was incapacitated and could only mutter the words "against my will." When the judge asked if she would consent to the transfusion, "[s]he indicated, as best I could make out, that it would not then be her responsibility." 331 F.2d at 1007. The judge then "reversed" the district court and permitted the hospital to administer blood, reasoning in part that the state had a parens patriae interest in preventing abandonment of a minor child and the patient had a responsibility to her community to care for the infant. In re Winthrop University Hospital, 128 Misc.2d 804, 490 N.Y.S.2d 996 (Sup.Ct. 1985) followed Georgetown to order the mother of two minor children to receive blood transfusions during kidney stone removal surgery despite the religious objections of the patient and her husband.
Although the reasoning of Fosmire, Munoz, Farrell, Osborne, Winthrop and Georgetown lends some guidance to this Court, all are more similar to Wons than Dubreuil in that there was no question that spouses or others would assume responsibility for the children when treatment was refused. Georgetown is further distinguishable because the mother was incapacitated when asked to consent. Moreover, that decision has little precedential value given that most of the judges on the circuit court disagreed with Judge Wright, albeit for a variety of reasons, when they were asked to rehear the case en banc. Georgetown, 331 F.2d at 1010-1018 (opinions of Washington, J., Danaher, J., Miller, J., Burger, J.). Winthrop is undermined by its reliance on Georgetown, and by the New York Court of Appeals' subsequent decision in Fosmire. Moreover, Georgetown and Winthrop may well conflict with Florida constitutional law as expressed in Wons.
[9] See also Alan Meisel, The Right to Die § 4.15 (1989) (noting the possibility that the state interest in protecting innocent third parties may not be limited to minor children because "[o]ther close relatives, including adult offspring of the patient and perhaps even persons emotionally close to the patient but not related by blood or marriage, might be able to assert a substantial interest in the patient's continued life").
[10] The district court termed this interest as a parens patriae interest of the State. Dubreuil, 603 So.2d at 541. We, however, do not view the state interest to protect innocent third parties as a parens patriae interest because the State is looking to protect society, not just children, from all of the consequences of abandonment.
[11] Of course, parenting is not just a statutory responsibility  it is a constitutional right. See Padgett v. Department of Health & Rehabilitative Servs., 577 So.2d 565, 570-71 (Fla. 1991) (Florida law has long recognized fundamental constitutional parental rights and interests in maintaining parental ties); accord, e.g., Santosky v. Kramer, 455 U.S. 745, 753-54, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982) (the sanctity of the parent-child relationship is a fundamental liberty interest protected by the federal constitution); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (a man's interest in the children he sired and raised "warrants deference and, absent a powerful countervailing interest, protection"); see also Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942) (right to conceive and raise one's own children is one of the "basic civil rights of man"); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) (right to conceive and raise one's own children is "essential").
[12] The State's only concern is that the children would be cared for and would not be a burden on the State.
[13] We note that marriage does not destroy one's constitutional right to personal autonomy. In In re Guardianship of Browning, 568 So.2d 4 (Fla. 1990), we held in relevant part that "when the patient has left instructions regarding life-sustaining treatment, the surrogate must make the medical choice that the patient, if competent, would have made, and not one that the surrogate might make for himself or herself, or that the surrogate might think is in the patient's best interests." Id. at 13 (emphasis supplied). The majority below said it looked to the husband's consent as "relevant only for the purpose of considering whether alternative care for the surviving children is available, in weighing the overriding interest of the state, and in determining whether or not the spouse's decision to refuse the transfusion constitutes an abandonment." Dubreuil, 603 So.2d at 542. However, implicit in the decision of the trial court, and in its approval by the district court, is acceptance of the hospital's decision to allow Luc to assert his own views over Patricia's wishes. This is impermissible. See Browning.