Laura L. **PEMBERTON,**
et al., Plaintiffs,

v.

**TALLAHASSEE MEMORIAL RE-
GIONAL MEDICAL CENTER,
INC., Defendant.**

No. 4:98CV161–RH.

United States District Court,
N.D. Florida,
Tallahassee Division.

Oct. 13, 1999.

Marie A. Mattox, Mattox & Hood PA, Tallahassee, FL, Kenneth L. Connor, Scott Edward Gwartney, Wilkes & McHugh PA, Tallahassee, FL, for Plaintiffs.

Laura Beth Faragasso, Henry Buchanan Hudson, Tallahassee, FL, Jesse F. Suber, Henry Buchanan Hudson et al, Tallahassee, FL, for Defendant.

### ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANT

HINKLE, District Judge.

This action arises from a state court's order compelling plaintiff Laura L. Pem-

berton, who was in labor attempting vaginal delivery at home at the conclusion of a full-term pregnancy, to submit to a caesarean section that was medically necessary in order to avoid a substantial risk that her baby would die during delivery. Based on the state court's order, physicians on the medical staff of the defendant hospital performed the caesarean section, resulting in the birth of a healthy baby. Ms. Pemberton suffered no complications.

Ms. Pemberton asserts the procedure was not medically necessary. She claims the physicians who rendered opinions that the procedure *was* medically necessary (and for whose actions the hospital has accepted responsibility), as well as the hospital itself, acted under color of state law. Ms. Pemberton claims the hospital and physicians violated her substantive constitutional rights and her right to procedural due process. Ms. Pemberton also alleges Florida common law theories of negligence and false imprisonment. Concluding that Ms. Pemberton's constitutional rights were not violated and that the hospital and physicians were not negligent, I grant summary judgment in favor of the hospital.

### Background

Ms. Pemberton delivered a prior baby in 1995 by caesarean section. Most caesarian sections are performed using a horizontal incision. Ms. Pemberton's 1995 caesarian, however, was performed using a vertical incision. Moreover, the vertical incision extended well beyond a traditional low vertical incision up into the thickened myometrium. The nature of this caesarean presented a greater risk of uterine rupture during any subsequent vaginal delivery than would be the case with a more typical caesarean section.

When she became pregnant again in 1996, Ms. Pemberton attempted to find a physician who would allow her to deliver vaginally. She was unable to find any physician who would do so. Every physician she contacted advised her that, because of the type of caesarean section she had undergone previously, vaginal delivery was not an acceptable option.

Undeterred, Ms. Pemberton made arrangements to deliver her baby at home, attended by a midwife, without any physician attending or standing by and without any backup arrangement with a hospital. On January 13, 1996, after more than a full day of labor, Ms. Pemberton determined she needed an intravenous infusion of fluids; she had been unable to hold down food or liquids and was becoming dehydrated. She went with her husband, plaintiff Kent Pemberton, to the emergency room of defendant Tallahassee Memorial Regional Medical Center ("the hospital"), where she requested an IV.

Ms. Pemberton first saw a family practice resident on call for obstetrics, who brought the case to the attention of Dr. Wendy Thompson, a board-certified family practice physician whose practice included obstetrics. Dr. Thompson advised Ms. Pemberton that she needed a caesarean section. Ms. Pemberton refused, saying she wanted only an IV so she could return home to deliver vaginally. Dr. Thompson declined to assist in that plan by ordering only an IV and instead notified hospital officials of the situation. Hospital officials set about securing additional opinions from board certified obstetricians Dr. A.J. Brickler and Dr. David R. O'Bryan, the chairman of the hospital's obstetrics staff. Dr. Brickler and Dr. O'Bryan each separately concurred in the determination that a caesarean was medically necessary. Meanwhile, the Pembertons left the hospital against medical advice, apparently surreptitiously.

The hospital set in motion a procedure devised several years earlier (and used once previously) to deal with patients who refuse to consent to medically necessary treatment. The hospital called its longtime attorney, John D. Buchanan, Jr., who in turn called William N. Meggs, the State Attorney for Florida's Second Judicial Circuit, where Tallahassee is located. Mr. Meggs, who had the responsibility under Florida law to institute any court proceeding seeking to compel a medical procedure

without a patient's consent,[1] deputized Mr. Buchanan as a special assistant state attorney for purposes of dealing with this matter. Mr. Buchanan contacted Second Circuit Chief Judge Phillip J. Padovano, advised him of the situation and of Mr. Buchanan's intent to file a petition on behalf of the State of Florida seeking a court order requiring Ms. Pemberton to submit to a caesarean section, and requested a hearing.

Judge Padovano went to the hospital and convened a hearing in the office of hospital Senior Vice President and Chief Medical Officer Dr. Jack MacDonald. In response to the judge's questions, Drs. Thompson, Brickler and O'Bryan testified unequivocally that vaginal birth would pose a substantial risk of uterine rupture and resulting death of the baby.

Judge Padovano ordered Ms. Pemberton returned to the hospital. Mr. Meggs and a law enforcement officer went to Ms. Pemberton's home and advised her she had been ordered to return to the hospital. She returned to the hospital by ambulance against her will.

Judge Padovano then continued the hearing in Ms. Pemberton's room at the hospital. Both she and Mr. Pemberton were allowed to express their views. The judge ordered that a caesarean section be performed.

Dr. Brickler and Dr. Kenneth McAlpine performed a caesarean section, resulting in delivery of a healthy baby boy. Ms. Pemberton suffered no complications.

In due course, Mr. Buchanan prepared a written petition setting forth the claim for relief previously submitted orally and a proposed order. Judge Padovano entered the order on February 2, 1996. Ms. Pemberton did not appeal.[2]

Ms. Pemberton now seeks in this federal court an award of damages against the hospital. She has not named the physicians as defendants because the hospital has agreed, for purposes only of the claims at issue in this lawsuit, that the physicians acted as agents of the hospital, thus allowing entry of a judgment against the hospital for any claim established against any or all of the physicians.

Ms. Pemberton claims that the forced caesarean violated her substantive constitutional rights and that the procedure that led to entry of the order violated her right to procedural due process. She seeks relief under 42 U.S.C. § 1983 and, alleging conspiracy, under 42 U.S.C. § 1985. Ms. Pemberton also alleges common law negligence, in effect, medical malpractice, as well as false imprisonment arising from her forced return to the hospital. Mr. Pemberton joins as a plaintiff alleging loss of consortium.[3]

The hospital has moved for summary judgment. For the reasons that follow, I grant the motion.[4]

---

1. See *In re Dubreuil,* 629 So.2d 819 (Fla. 1993).

2. The order as prepared by Mr. Buchanan and entered by the court erroneously said that Drs. Thompson, O'Bryan and Bricker [sic] all "stated that unless a C–Section is done, that the live viable fetus will die and in their medical opinion it is absolutely necessary as a lifesaving procedure to perform a C–Section on the patient." The order included a finding that "if a C–Section is not done, then this viable fetus at term would die based upon competent medical testimony." According to the uncontested testimony in the record now before this court, this was an exaggeration of the testimony that was given at the hearing before Judge Padovano; the doctors said there was a substantial and unacceptable risk of death, not that death was a certainty.

3. The Pembertons originally named Mr. Buchanan as an additional defendant. After he moved for summary judgment, they agreed to dismiss their claims against him.

4. The applicable standards for addressing a motion for summary judgment are well settled. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Smith v. FDIC,* 61 F.3d 1552, 1562 n. 18 (11th Cir.1995); *United States v. 2204 Barbara Lane,* 960 F.2d 126, 129 (11th Cir.1992). Genuine factual disputes are resolved in favor of the non-moving party. I do so here.

## Discussion

## I. SUBSTANTIVE CONSTITUTIONAL RIGHTS

■ Ms. Pemberton invokes a variety of theories in support of her claim that requiring her to undergo a caesarean section was unconstitutional. She asserts a right to bodily integrity, a right to refuse unwanted medical treatment, and a right to make important personal and family decisions regarding the bearing of children without undue governmental interference. She also invokes her right to religious freedom, although she does not specifically delineate the belief she says was violated or specifically identify its religious mooring.[5]

All of these are important interests of constitutional dimension. With the exception of religion, the Constitution does not explicitly address these various interests, but their constitutional stature has been recognized repeatedly.[6] Ms. Pemberton invokes the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution; all of these save the Eighth probably speak to the interests at issue. While the precise reach of these various constitutional principles in this context remains unclear, it cannot be doubted that Ms. Pemberton had important constitutional interests that were implicated by the events the hospital set in motion.

Recognizing these constitutional interests, however, is only the beginning, not the end, of the analysis. Ms. Pemberton was at full term and actively in labor. It was clear that one way or the other, a baby would be born (or stillborn) very soon, certainly within hours. Whatever the scope of Ms. Pemberton's personal constitutional rights in this situation, they clearly did not outweigh the interests of the State of Florida in preserving the life of the unborn child.[7]

This is confirmed by *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). There the Court recognized the state's increasing interest in preserving a fetus as it progresses toward viability. The Court concluded that by the point of viability—roughly the third trimester of pregnancy—the state's interest in preserving the life of the fetus outweighs the mother's own constitutional interest in determining whether she will bear a child.[8]

The balance tips far more strongly in favor of the state in the case at bar, because here the full-term baby's birth was imminent, and more importantly, here the mother sought only to avoid a particular procedure for giving birth, not to avoid giving birth altogether. Bearing an unwanted child is surely a greater intrusion on the mother's constitutional interests than undergoing a caesarean section to deliver a child that the mother affirmatively desires to deliver.[9] Thus the state's

5. Ms. Pemberton apparently does not oppose all caesarians, only those she deems unnecessary. This belief apparently is not rooted in any traditional religion. This of course does not mean, however, that the belief is not religious. I assume for purposes of this opinion that Ms. Pemberton does indeed have a good faith religious belief against the performance of caesarean sections deemed unnecessary.

6. *See, e.g., Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 278–79, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *see generally* L. Tribe, *American Constitutional Law* ch. 15 (2d ed.1988).

7. In this opinion I sometimes refer to the full-term fetus as a "baby." I do so not to signal any view of any substantive issue but instead

because it seems more respectful to what is now a living baby boy.

8. There of course are those who take issue with the decision in *Roe v. Wade.* The disagreement, however, is primarily with *Roe's* holding that prior to viability, the mother's constitutional interest is sufficient to overcome the state's interest in preserving the life of the fetus, that is, with that part of *Roe* that recognizes a woman's right to an abortion at earlier points in her pregnancy. *Roe's* holding that after viability the state has a compelling interest in preserving the life of the fetus has been subject to considerably less disagreement and is, in any event, controlling authority.

9. It is true, of course, that a caesarean is an affirmative surgical procedure, while in the

interest here was greater, and the mother's interest less, than during the third trimester situation addressed in *Roe*. Here, as there, the state's interest outweighed the mother's.[10]

Ms. Pemberton of course does not explicitly argue that her interest in avoiding a caesarean was greater than the baby's interest in living. Merely to state such a proposition is to refute it.[11] Nor does Ms. Pemberton explicitly assert that the state could not consider the baby's interest in living as a basis for overriding her own refusal to consent to a caesarean section.[12]

Ms. Pemberton does assert, however, that what was at stake was not the baby's interest in living, because, she says, vaginal delivery did not pose an appreciable risk of the baby's death as the doctors claimed. She says she could and would have delivered her baby vaginally without harming him in any way.

The medical evidence belies Ms. Pemberton's bravado. The evidence is this. After a caesarean section of the type Ms. Pemberton previously had undergone (that is, a caesarean involving a vertical incision extending well beyond a traditional low vertical incision up into the thickened myo-

third trimester situation discussed in *Roe*, the state does not affirmatively take any action but simply prevents the mother from acting to terminate the life of the fetus. One could argue that affirmative intervention is more intrusive on the mother's constitutional interests than the mere prohibition discussed in *Roe*. But any such distinction between affirmative conduct and mere prohibitions is superficial. Whether phrased as affirmative conduct or mere prohibition, the fact is that in *Roe* the Court said a third-trimester mother can be forced against her will to bear a child she does not want; this is in fact a substantially greater imposition on the mother's constitutional interests than requiring a mother to give birth by one method rather than another. And this is so notwithstanding that caesarean section is major surgery that is extraordinarily intrusive on the mother's constitutional interests.

**10.** In *Roe*, the Court held a fetus not a "person" imbued with its own constitutional rights. Whether that conclusion is equally applicable when labor is in progress and birth imminent need not be addressed here, because the state's interest in a viable, full-term fetus whose delivery is imminent is sufficient to defeat a claim of the type advanced by Ms. Pemberton, even if such a fetus is not deemed a "person" with his or her own constitutional rights.

**11.** While it is only rarely that a mother refuses to consent to a medical procedure necessary to the survival of her viable fetus, at least two state supreme courts have held the fetus's interest in survival outweighs the mother's interest in resisting such a procedure. See *Jefferson v. Griffin Spalding County Hosp. Auth.*, 247 Ga. 86, 274 S.E.2d 457 (1981) (refusing to stay order requiring unconsented caesarean section necessary to save life of fetus); *Raleigh Fitkin–Paul Morgan Me-*

*morial Hosp. v. Anderson*, 42 N.J. 421, 201 A.2d 537 (1964) (ordering unconsented blood transfusion necessary to health of fetus); *see also In re Dubreuil*, 629 So.2d 819 (Fla.1993) (recognizing that the interest of living children in the survival of their parent is a factor properly considered in determining whether to require the mother to submit to an unconsented medical procedure necessary to save the mother's life); *Public Health Trust v. Wons*, 541 So.2d 96, 97 (Fla.1989) (same).

**12.** So far as I am aware, no court has held that, in determining the constitutionality of requiring such a procedure, the interests of a viable fetus cannot be considered. An Illinois intermediate appellate court did hold, as a matter of state law, that the interests of a fetus cannot be considered; the court held that, under Illinois state law, a mother has an absolute right to refuse a caesarean section regardless of her fetus's interests. See *In re Baby Boy Doe*, 260 Ill.App.3d 392, 198 Ill. Dec. 267, 632 N.E.2d 326 (1994). That a state is free to adopt that approach if it chooses (as the *Baby Boy Doe* court ruled Illinois has done) does not mean that, as a matter of federal constitutional law, a state *must* choose that approach. The law of Florida is not nearly so inflexible as the *Baby Boy Doe* court's reading of Illinois law. See, e.g., *In re Dubreuil*, 629 So.2d 819 (Fla.1993) (considering interests of living children in assessing appropriateness of requiring mother to submit to unconsented procedure). In any event, to the extent *Baby Boy Doe* suggests a medical procedure can never be forced on a citizen even if the importance of the procedure clearly outweighs the intrusion on the citizen's interests, the court was simply wrong; states can and routinely do require such procedures as immunizations of children, under appropriate circumstances.

metrium), it is possible for a woman to deliver vaginally without uterine rupture or other complications. Nonetheless, there is a very substantial risk of uterine rupture and resulting death of the baby (as well as serious injury to the mother).

The record includes testimony of six physicians on this subject. Five—those whose testimony has been offered by the hospital [13]—uniformly assert the risk of uterine rupture from any vaginal delivery in these circumstances is unacceptably high and the standard of care therefore requires a caesarian. Dr. O'Bryan, for example, placed the risk at four to six percent.[14] When the consequence is almost certain death, this is a very substantial risk; as the physician convincingly explained, if an airline told prospective passengers there was a four to six percent chance of a fatal crash, *nobody* would board the plane.

In response, Ms. Pemberton offered the affidavit of a sixth physician, Dr. Marsden G. Wagner.[15] Dr. Wagner placed the risk of uterine rupture slightly lower, at between two and 2.2 percent, and said the risk the baby would die if there was a rupture was 50 percent. If these are the facts, it is hardly surprising that Ms. Pemberton could find no physician willing to attend an attempted vaginal delivery. Presumably there would still be no passengers on a plane if the risk of a crash was only two percent and if, in any crash, only half the passengers would die.

Moreover, Dr. Wagner's analysis assumes a delivery in a hospital attended by a physician. In fact, however, Ms. Pemberton was in the process of attempting vaginal delivery at home without a physician either participating or standing by. Prior to attempting to deliver vaginally at home, Ms. Pemberton was unable to locate a single physician willing to attend the birth; this shows just how widely held was the view that this could not be done safely. Ms. Pemberton's request to the hospital was not that she be allowed to deliver vaginally at the hospital but instead that the hospital provide an IV so that she could return home to deliver there.[16] Even Dr. Wagner does not suggest that Ms. Pemberton could have delivered safely at home without an attending or even a standby physician.[17]

---

**13.** These are Drs. McAlpine, Brickler, Thompson, O'Bryan and Steven L. Clark.

**14.** Dr. Clark, a national expert, said prevailing medical opinion places the risk at between six to ten percent, at the low end, to as high as 60%. (Document 103, ex. 2, ¶ 7).

**15.** Dr. Wagner has impressive credentials but was based in Denmark, not the United States, from the 1980s until 1997, after the events at issue. For all this record indicates, in recent years he has lectured, consulted or attended rounds but apparently has not practiced. The tenor of his testimony is that of an advocate, not a witness. I nonetheless accept his testimony (though not all his rhetoric and legal conclusions) as true.

**16.** Ms. Pemberton has made no claim that any physician was obligated to attend a vaginal delivery against his or her own wishes and contrary to his or her own medical judgment. Nor has Ms. Pemberton claimed the hospital had a duty to allow her to deliver vaginally in the hospital. Hospitals do not practice medicine and cannot support the delivery of a baby without an attending phy-

sician. Hospitals *are* required to provide emergency services in accordance with the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd; hospitals thus ordinarily may not turn away patients in active labor or who need emergency treatment. Hospitals satisfy this obligation through physicians on their medical staffs. Here Ms. Pemberton voluntarily (and apparently surreptitiously) left the hospital; the hospital did not turn her away. She has made no claim under EMTALA. The materials she has submitted make clear that her position that night, and indeed her position in this lawsuit, is that she should have been allowed to deliver at home. *See, e.g.,* Document 87, ex. 2 (expert witness reports submitted by plaintiff).

**17.** There may have been practicing physicians in the United States who believed Ms. Pemberton could have delivered vaginally (even though Ms. Pemberton failed to locate any such physician). It is inconceivable, however, that any competent physician would have approved attempting vaginal delivery in a home, without readily available and prearranged medical backup. Dr. Wagner's testimony is not to the contrary.

Medicine is not an exact science. The physicians who, on the night at issue, rendered opinions regarding the risk Ms. Pemberton faced from vaginal delivery did not and could not know with certainty whether that risk would be realized in her case. Similarly, the hospital, state attorney and state court who relied on the physicians' opinions could not know with certainty the outcome Ms. Pemberton would encounter. In anything other than an extraordinary and overwhelming case, the right to decide would surely rest with the mother, not with the state. But based on the evidence disclosed by this record, this was an extraordinary and overwhelming case; no reasonable or even unreasonable argument could be made in favor of vaginal delivery at home with the attendant risk of death to the baby (and concomitant grave risk to the mother). On the clear and uncontradicted evidence, the interests of the baby required a caesarean section.[18]

Because of the very substantial risk that the course Ms. Pemberton was attempting to pursue would result in the death of her baby, requiring her to undergo an unconsented caesarean section did not violate her constitutional rights.[19]

## II. PROCEDURAL DUE PROCESS

Ms. Pemberton also claims she was denied procedural due process. This claim is unfounded on the merits and in any event would provide no basis for relief in this court.

■ First, the merits. The state judge afforded Ms. Pemberton notice and an opportunity to be heard prior to ordering performance of the caesarean section. She and Mr. Pemberton took the opportunity and were in fact heard by the court. Under the circumstances, this was all the process that was feasible. The baby's birth was imminent; convening a full adversary hearing with greater advance notice would have been impossible. The notice and opportunity to be heard that the Pembertons in fact received thus constituted all the process that was due. *See, e.g., Goss v. Lopez,* 419 U.S. 565, 581–82, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975) (recognizing that Due Process Clause does not invariably require full adversary hearing but that more limited process may be sufficient in given circumstances); *Nash v. Auburn Univ.,* 812 F.2d 655, 660 (11th Cir.1987) (noting that "[w]hat process is due is measured by a flexible standard that depends on the practical requirements of the circumstances"); Fed.R.Civ.P. 65 (recognizing court's ability to enter emergency order with less than full adversary hearing and even, in appropriate circumstances, without notice).

■ Second, this court would in any event have no authority to review the pro-

---

**18.** Ms. Pemberton notes that performing a caesarean section was not without risk. Medical procedures rarely are. Dr. Wagner's affidavit confirms that there are risks from caesareans; notably, however, he fails to quantify the risk of serious harm to either the mother or baby. The risk from a caesarean was far less, by orders of magnitude, than the risk from vaginal delivery, as Dr. Wagner's failure to quantify the risk seems to acknowledge. This case is thus markedly different from *In re A.C.,* 573 A.2d 1235 (D.C.App.1990), in which the court held that a caesarean could not properly be ordered for a terminally ill woman in her 26th week of pregnancy whose death would be hastened by the performance of the proposed caesarean. *In re A.C.* left open the possibility that a non-consenting patient's interest would yield to a more compelling countervailing interest in an "extremely

rare and truly exceptional" case. 573 A.2d at 1252. The case at bar is such a case.

**19.** In addition to her substantive constitutional claims as addressed in the text above, Ms. Pemberton asserts a "conspiracy" claim under 42 U.S.C. § 1985. This adds nothing to her other constitutional claims; if her constitutional rights were not denied, the fact that the persons who did not deny her rights acted jointly makes no difference. In any event, the physicians all have testified, without contradiction, that they reached their medical opinions independently and that they did not act jointly in rendering their opinions. And when a hospital relies on the advice of physicians on its medical staff with respect to medical issues, it does not thereby become a conspirator.

cedures followed by a state court in deciding a case within its jurisdiction. If the Pembertons were dissatisfied with the state court's procedures or decision, their remedy was to appeal. Federal review of any ultimate decision of the Florida state courts would have been available only in the United States Supreme Court by petition for writ of certiorari. Federal district courts do not have jurisdiction to hear challenges to state court rulings. *See, e.g., Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). Ms. Pemberton's procedural due process claim is a challenge to the state court's order and, as such, is barred by the *Rooker–Feldman* doctrine.[20]

## III. PROFESSIONAL NEGLIGENCE

Ms. Pemberton also asserts that the physicians were negligent in rendering their opinions concerning the risks of vaginal birth and that the hospital was negligent in admitting these physicians to its medical staff and relying on their opinions.

■ Physicians owe their patients the duty to use reasonable care. Reasonable care on the part of a physician is that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by similar and reasonably careful physicians, that is, the prevailing professional standard of care. *See, e.g.,* § 766.102, Fla. Stat. (1997); Fla. Standard Jury Instructions (Civil) § 4.2a.[21] Hospitals owe their patients an analogous duty, determined with reference to reasonably careful hospitals.

In the case at bar, the duty of the treating physicians extended not only to the actual performance of the caesarean section but also to the diagnosis, advice and information that they provided. Making a diagnosis, advising the patient of options, and informing the patient of risks are part of the services that physicians have a duty to perform with appropriate care.

The hospital asserts, however, that Ms. Pemberton did not voluntarily seek care from the hospital or physicians, was therefore not a "patient" to whom they owed any duty, and in any event did not rely on the physicians' advice. Thus, says the hospital, Ms. Pemberton would have no claim against the physicians (or the hospital on their behalf) based on the advice they gave, even if the advice was rendered negligently. I disagree.

■ A physician's duty with respect to advice and information extends not only to the actual patient but, in appropriate circumstances, to the person who makes the treatment decision on the patient's behalf. When the patient is a competent, consenting adult, the duty is to use due care in providing advice and information to the patient. But when someone else— a parent or guardian, for example—is responsible for making the relevant medical decision, the physician's duty surely encompasses the advice and information provided to that person. I assume, for purposes of this decision, that when the decision maker is the state court, the treating physician's duty to use due care in providing advice and information is the same.[22]

20. Ms. Pemberton's substantive constitutional claims, as addressed in section I of this opinion, also come close to the edge of *Rooker–Feldman* territory. But her substantive claims, unlike her procedural claim, challenge the acts of the hospital and physicians that preceded the state court's decision; those claims are not solely or even primarily a challenge to the state court's ruling. Those claims are not barred by *Rooker–Feldman.*

21. When, as here, board certified physicians are involved, the standard is that recognized by reasonably careful physicians with the same board certification; the standard is not determined by the practice in the particular locality. *See* § 766.102(2)(b), Fla.Stat. (1997).

22. There is no apparent reason why this should not be so. In situations of this kind, the judge relies on the physician's advice just as surely as does a consenting patient in an

Ms. Pemberton's claim here founders not on the procedural hurdles the hospital puts in her way but instead on the merits. The physicians were not negligent. The hospital was not negligent. Not only did they carry out the caesarean section without a hitch, but their actions that set the process in motion and led to entry of the state court's order were unassailable.

When a patient presents at a hospital emergency room, a hospital ordinarily acts reasonably when it relies on the medical advice of appropriate physicians. Dr. Thompson, who first determined that Ms. Pemberton needed a caesarean section, was board certified in family practice and routinely treated obstetrics patients. Ms. Pemberton has cast not the slightest doubt on her credentials or competence. When Dr. Thompson said Ms. Pemberton needed a caesarean section to avoid an unacceptable risk of death or injury to the baby, the hospital did precisely what it should have done: it invoked the legal process. The hospital also took the additional and quite reasonable step of securing additional medical opinions from board certified obstetricians Dr. Brickler and Dr. O'Bryan. Again, Ms. Pemberton has cast not the slightest doubt on the credentials or competence of these physicians.

In invoking the legal process, the hospital again proceeded reasonably, relying on the advice of its duly licensed and fully competent attorney. The hospital ultimately took no action except as ordered by the state court on petition fully approved by the State Attorney.[23]

That leaves for analysis the advice provided by the physicians. The uncontradicted evidence in this record is that the physicians' advice was correct in all material respects. They have testified that a vaginal birth in these circumstances would have presented a substantial risk of uterine rupture and resulting death of the baby, as well as a substantial risk to the health of the mother. Dr. Wagner's testimony is not to the contrary. He too acknowledges that a vaginal birth would have presented a substantial risk of uterine rupture, death of the baby, and danger to the mother. And there is no evidence contradicting the seemingly obvious conclusion that attempting vaginal delivery at home posed unnecessary risk.

To be sure, Dr. Wagner disagrees with the other physicians concerning what level of risk is "acceptable," and she quantifies the risk as slightly lower—a two percent risk of rupture and resulting 50 percent risk of death of the baby, as compared to a four to six percent risk of rupture and resulting near certain death—but there is no indication these numbers were given to or asked for by the state court judge who made the decision. Dr. Wagner says a one percent risk of the baby's death (calculated

ordinary case. If that advice is rendered negligently and the patient suffers injury as a result, the patient's right to redress should not be less than if the procedure had been performed with the patient's own consent. Surely we should expect no less of a physician rendering treatment contrary to a patient's wishes than we expect of a physician treating a patient who consents.

**23.** To be sure, Ms. Pemberton asserts the hospital failed to follow the procedure mandated by *In re Dubreuil*, 629 So.2d 819 (Fla.1993). There the Florida Supreme Court ruled that when a hospital patient refuses to consent to a medically necessary procedure, the state attorney, not the hospital, should institute any proceeding seeking a court order overriding the failure to consent. In the Second Judicial Circuit, state attorney William N. Meggs has adopted a practice of appointing the hospital's attorney as a special assistant state attorney on a case-by-case basis for the purpose of having that attorney carry the laboring oar in presenting any such case. The hospital's attorney Mr. Buchanan was so appointed and performed that role here, while Mr. Meggs himself also participated personally and substantially. The state court apparently approved that approach. Whether this complied with state procedural rules is of no significance here; it is uncontested that the State Attorney personally approved the submission of the state court petition and that the state court made the decision to proceed with the caesarean. Any failure to follow *Dubreuil* may have provided a ground for appeal of the state court's judgment but would provide no basis for relief in federal court and was in any event harmless.

based on a fifty percent death rate in the two percent of cases that result in uterine rupture) is acceptable, but there is no reason to think the state court would have agreed, and in any event it is not negligent for a physician to classify as "unacceptable" an avoidable one percent risk of fetal death. Nor is such a physician required to quantify in percentage terms the "unacceptable" risk he or she identifies.

The hospital, physicians who considered the matter on the night at issue, and ultimately the state court were faced with a mother who had decided to deliver her baby vaginally at home. Ms. Pemberton's own expert now places the risk of the baby's death from attempted vaginal delivery in a hospital at one percent. As is uncontested, the risk of death from attempted vaginal delivery at home would have been higher. With little time to act, the physicians gave what they believed, and still assert, was correct advice. Regardless of whether the actual risk of the baby's death was one percent or six percent or 60 percent, the risk was substantial, as the physicians testified at the time. The advice that the risk of death was substantial was not negligent.

Had Dr. Wagner been available to attend an attempted vaginal delivery in a hospital where he had privileges, the state court almost surely would have allowed him to do so. This hospital and these physicians would surely have been pleased not to be involved. But Ms. Pemberton had found neither Dr. Wagner nor any other physician who believed vaginal delivery could be attempted safely. Ms. Pemberton was proceeding at home without medical care or backup. This hospital sought opinions of three qualified physicians on its medical staff; they rendered unassailable opinions that there was a substantial risk the baby would die if a vaginal delivery was attempted; and the hospital submitted the matter to the state court based on the best (and only) medical evidence then available.

In short, Ms. Pemberton has presented insufficient evidence to support her claim that the hospital or physicians were negligent. The hospital has established the contrary and is entitled to summary judgment.

## IV. FALSE IMPRISONMENT

 Finally, Ms. Pemberton alleges that her transportation from her home to the hospital against her will pursuant to the state court's order constituted false imprisonment. This theory adds nothing to Ms. Pemberton's other claims. Any order requiring a patient to submit to a procedure against her will necessarily restrains the patient's movement; if the order is valid, the restraint is not false imprisonment. That Ms. Pemberton was moved across town, rather than across the hospital, does not change the analysis. In any event, if a patient can be and is lawfully ordered by a court to submit to a procedure, the patient obviously cannot nullify the court order by simply leaving the hospital. Bringing Ms. Pemberton back to the hospital pursuant to court order was not false imprisonment.

### Conclusion

Because Ms. Pemberton's constitutional rights were not violated and the hospital and physicians on its medical staff were not negligent,

IT IS ORDERED:

The motions of defendant Tallahassee Memorial Regional Medical Center, Inc. for summary judgment (documents 83 and 102) are GRANTED. The clerk shall enter judgment providing, "All claims are dismissed with prejudice." The clerk shall close the file.

SO ORDERED.