Matter of Martin F. (2006 NY Slip Op 26339)

Matter of Martin F.

2006 NY Slip Op 26339 [13 Misc 3d 659]

August 23, 2006

O'Connor, J.

Family Court, Monroe County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Friday, December 08, 2006

[*1]
In the Matter of Martin F. and Another, Children Alleged to be Neglected. D.L., Respondent.
Family Court, Monroe County, August 23, 2006

APPEARANCES OF COUNSEL

Daniel M. DeLaus, Jr., County Attorney (Alecia Spano of counsel), for Monroe County Department of Human Services. Edward J. Nowak, Public Defender (Christine F. Redfield of counsel), for respondent. Legal Aid Society (Deral Givens of counsel), Law Guardian.

OPINION OF THE COURT

Marilyn L. O'Connor, J.
As required for a permanency hearing, on March 28, 2006 a permanency hearing report was signed, verified and submitted to the court by a Monroe County Department of Human Services (DHS) caseworker in the above-captioned neglect matter. That report indicates that Depakote Sprinkles (also known as valproic acid and valproate), an antipsychotic drug, had been prescribed for three-year-old Desiree L. (date of birth 2002), over the objection of her mother. Desiree had been moved into four different foster care homes in approximately five months. By the issuance of the March 2006 permanency hearing report she had been in her fourth foster care home[FN1]

for about six months, but despite the relative stability, her behavior was allegedly getting worse instead of better. The respondent mother had been found to have neglected Desiree and [*2]her brother, causing their removal on or about April 7, 2005.[FN2]

Desiree's goal was "return to parent," and at the time of the report, her return was expected in the very near future. The report indicated her mother was active in a MICA (mentally ill, chemically addicted) program and was clean and sober but needed to get supportive housing for herself and her children before they could be returned. Because Depakote Sprinkles was being administered over the mother's objection, the anticipated permanency planning hearing was advanced to March 29, 2006. The issue of whether DHS could lawfully give Desiree Depakote Sprinkles, a serious psychotropic drug with significant known side effects, over the objection of the child's mother, needed to be addressed promptly. Desiree's mother had signed a department "Medical Authorization Form" on April 14, 2005 authorizing the Department to provide and obtain medical and dental care as described therein, including specifically "referrals, evaluations, consultations and/or treatment for identified behavioral and emotional problems (this does not include the prescription of medication for these issues, which requires a separate consent)." (Emphasis added.) That authorization additionally stated, "I/We understand that my/our child would receive appropriate medical care in emergent or life threatening situations" and "I/We understand that this authorization does not include any medical or surgical procedures for which separate informed consent is required."
DHS represented that there was a protocol for overriding a parent's refusal to consent to medication for a child. In advance of the hearing, the court asked for the written policy and procedures regarding medicating children in foster care, particularly when the parent objects, but that had not been provided. The DHS records regarding this case were provided, certified as being complete, and admitted into evidence.
After the first day of testimony on March 29, 2006, including the medical testimony of the prescribing doctor, Dr. Moira Szilagyi, that it would not be "medically" or "physically" harmful to stop the Depakote Sprinkles at that time, this court ordered that the administration of that medication be stopped.
On May 5, 2006, the second day of testimony, DHS's attorney stated DHS withdrew its "request" to give the medication to the child. This court, however, noted that no "request" had ever been made to the court regarding the administration of the medication. Instead, this court noted, the fact that Depakote Sprinkles had been prescribed for the child was simply part of the report to be reviewed by the court at the statutorily required permanency planning hearing.
Despite the mootness created by DHS no longer seeking to have Desiree take Depakote Sprinkles, this court deemed it appropriate to follow through with testimony to determine the protocol used regarding medicating for behavioral or emotional problems over a parent's objection, and what should be done with respect to Desiree and the particular medication at issue herein. Otherwise, this important protocol issue, apparently of first impression, could arise again and again, and could always be rendered moot by DHS deciding to withdraw any medication actually creating a controversy or legal challenge (regardless of medical propriety). Furthermore, [*3]whether or not Desiree should take Depakote Sprinkles under the facts here would remain unreviewed and possibly determined more by strategic legal tactics than medical judgments carefully weighed.
The issues identified before the hearing included (1) whether there is a procedure within the Social Services Law to override a parent's refusal to consent to the administration of a medication to a child in foster care; (2) if so, was this procedure followed; and (3) what other policies or procedures exist, if any, that would allow the lawful administration of psychotropic drugs over a parent's objection. After the hearing, all counsel were given an opportunity to submit legal arguments, and all did so.

The Parties' Positions

DHS's position is that it had the authority to consent to medication on behalf of the child, due to Social Services Law § 383-b and 18 NYCRR 507.1. Neither the statute nor the regulation, however, mentions what to do when a parent of a child in foster care objects to the child being given a certain medicine. Neither mentions mental health. The Social Services Law itself provides:
"§ 383-b. Medical treatment for abused or neglected children; consent of commissioners.
"The local commissioner of social services or the local commissioner of health may give effective consent for medical, dental, health and hospital services for any child who has been found by the family court to be an abused child or a neglected child, or who has been taken into or kept in protective custody or removed from the place where he is residing, or who has been placed in the custody of such commissioner, pursuant to section four hundred seventeen of this chapter or section one thousand twenty-two, section one thousand twenty-four or section one thousand twenty-seven of the family court act." (Emphasis added.)
Unfortunately, there is no relevant case law citing the above section of the Social Services Law.
The New York Codes, Rules and Regulations at the most relevant portions of the cited section provide:
"§ 507.1 General responsibilities for health supervision and medical care for children.
"(a) It is the responsibility of the local social services district to provide for comprehensive medical services for children in foster care and to assure the availability and encourage the utilization of such services for children receiving services under a public assistance program. This responsibility will be jointly shared by the medical assistance unit and the children's services and public assistance staffs.
"(b) Administratively, the provision of medical care for children must be carried out in accordance with other provisions of this Subchapter and section 431.6 of this Title.
"(c) For children in foster care, health supervision is a continuing responsibility of the children's services caseworker and medical assistance staff of the local social services district. Such responsibility includes: . . . 
"(6) consulting with physicians, dentists, psychologists and other professional staff, as appropriate, regarding the significance of information and findings; 
"(7) determining actions to be [*4]taken to carry out treatment recommendations" (emphasis added).
There is nothing in either the state statute or the regulations about even consulting with the parent or parents of any child in foster care.
There was testimony by the prescribing doctor that there is applicable federal law regarding the administration of antipsychotic drugs to children over their parent's objection.[FN3]

Nonetheless, nothing in the federal law has been submitted or found. Thus, merely on the face of the state statute and its supporting regulations, it might appear that the Commissioner of Human Services can simply determine what prescription medicines shall be given to each and every child in foster care, without consulting with parents, but after consulting with appropriate professionals. Such a simple process, however, does not recognize, or take into consideration, the constitutional rights (1) of parents to make typical parental/family decisions for their children and (2) of children to be protected from unwarranted state intrusion into their mental and physical well-being.
Despite DHS's legal position as submitted, the evidence showed that the parents are routinely consulted by DHS—i.e., given an opportunity to consent. The evidence also revealed that if parents did not consent, their objections were simply overridden as a routine matter. The legal arguments submitted by DHS in the case at bar do not address the issue of what to do when the parent objects to DHS's position regarding a prescribed mental health medication. DHS simply relies on the authorities quoted above and its summary of facts regarding the prescription given to support its position that it may override parents' objections to medicating foster care children at will. Indeed, for purposes of its legal argument, DHS ignored the existence of the medical authorization form (in evidence as part of its file) which stated a separate consent would be needed, presumably from the parent, for prescription medicine for behavioral and emotional problems.[FN4]
[*5]
The mother's attorney argues that DHS should be required to apply to the court to override a parent's decision regarding medical care, including prescriptions for psychotropic drugs, citing two cases, among others. First is Santosky v Kramer (455 US 745 [1982]), regarding the due process rights of parents who have neglected their children. Second is Rivers v Katz (67 NY2d 485 [1986]), regarding forcible administration of antipsychotic medicine to institutionalized adults, who arguably may not be competent to make an informed decision regarding their own medications but have objected. She questions the constitutionality of the procedures followed. Accordingly, the Attorney General has been notified of the constitutional challenge, but has decided not to intervene at this stage of the litigation. The mother's attorney also argues that the procedures of DHS were not followed, and that the court should issue a permanent order prohibiting the foster care clinic from prescribing any psychotropic medication for Desiree.
The law guardian cites two cases on the administering of psychotropic drugs to arguably incompetent adult patients over their objection, Rivers and Matter of Michael L. (26 AD3d 381 [2006]). He seeks to extend the principles of those cases to the case at bar in order to require a showing of clear and convincing evidence in some unspecified manner, apparently to be determined by the court.

Decision Limited to its Facts

This decision is limited to its facts, and thus deals first with ruling on the constitutional validity of existing administrative procedures used by DHS to authorize giving a child psychotropic drugs for behavioral or emotional problems over a parent's objection. Secondly, it reaches the issue of whether Social Services Law § 383-b even applies to the facts of this case to authorize psychotropic drugs to be lawfully given to a child after an administrative consent without regard to the parent's position on the matter. It does not reach the constitutionality of Social Services Law § 383-b on its face, or the constitutionality of the consent process when parental consent is obtained through the process, because the respondent mother here did not consent.[FN5]

The Credible Facts About Desiree's Behavior

Desiree, age 2 (date of birth 2002), and her brother, age 12 (date of birth 1992), were removed from their mother's care and went into emergency foster care together in early April 2005. They both did well their first night, but the unfolding facts show Desiree, who entered the "system" as an apparently normal child, began a downhill slide into behavioral problems which worsened as she stayed longer and longer in a foster care system that moved her into four different foster care homes within a five-month time frame.
In mid-May 2005, Desiree was still a typical two year old, doing well, and in the "no" stage. On May 24, 2005, Desiree was described in the caseworker's notes as "Adorable!" She had an excellent appetite, was not picky, slept well, was potty-trained, had typical two-year-old tantrums, did not hit or bite, responded appropriately to time-outs, demonstrated excellent language skills, put on her own clothes, followed directions and was "well appearing" though "slightly [*6]uncooperative" for a medical exam. The only early exceptions to this description of a delightful, apparently developmentally normal child, were two incidents. First, after one week of foster care, Desiree smeared feces in the emergency foster care home bathroom and dropped a cell phone in the toilet. Second, after three weeks of foster care including one week in her second foster care home, Desiree hit her mother during visitation.
At the start of her second month in foster care Desiree was doing very well, and the same was true at the start of her third month in foster care. Unfortunately, by the start of her third month in foster care, Desiree was in a third foster care home, having moved on July 6, 2005. No reason was given for the move, but it was hoped that the new foster care mother would provide this "outgoing youngster" with the many avenues she needed to be active and playful. A psychosocial report dated July 15, 2005 said she was emotionally attached to her mother and missed living with her but did not demonstrate any trauma or anxiety when visits were concluded. While in this third foster care home, Desiree engaged in the odd behavior of pulling hard on her own hair for less than a minute, and had a bruise on her buttocks which looked like a bite mark. It is significant that Desiree was reportedly physically abused in this home, and allegedly in an earlier foster care home as well. No details of the alleged abuses are in the record, but by September 30, 2005, after only about five months, she was in her fourth foster care home.
On an unstated date before or after her switch to the fourth foster care home, Desiree, instead of separating easily from her mother as before, exhibited terrible separation anxiety upon being separated from her mother. During this one incident, her father failed to appear for his visit with her, scheduled at her mother's home. Desiree saw her mother, who had to leave for a dentist appointment, had an emotional meltdown, and went into a severe temper tantrum. She was unconsolable for about 40 minutes. A few days after the transfer to the fourth foster care home, Desiree furthermore refused to get out of the car to see the play therapist, and kept saying, "Mommy, Mommy." She finally got out when the "day care mother" came and got her. The caseworker believed this problem arose as Desiree thought she was going to see her mother, not the play therapist.
Desiree turned three years old in 2005, shortly after going to live with Mr. and Mrs. Doe. In that fourth foster care home, Desiree's behavior, as almost exclusively reported by the fourth foster care mother, Mrs. Doe, became more extreme. After initial crying and whining, Mrs. Doe testified Desiree allegedly had daily, sustained tantrums, if not several a day, for little or no apparent reason. For example, she changed her mind about what she wanted and started crying. She allegedly bit six people, and often woke up crying at night for more than an hour. Mrs. Doe responded to tantrums by putting three-year-old Desiree in her room till she calmed down, and as a consequence she was often left alone in her room kicking, crying and screaming for far longer than the typically recommended one minute of time-out per year of age. When Desiree screamed for her big brother Martin to come to help her, he was generally not allowed to go, though he had assumed a parental role for her even before the children went into day care. In fact, she called him "Pa" and he referred to himself as her "Pa." Only once or twice a week was Martin allowed to comfort his upset little sister. It appears she was being punished for her bad behavior by being deprived of the one family member still in her household. Desiree was placed in day care from 8:00 a.m. to 5:00 p.m. to give the foster care mother respite.
Oddly, no one else, not her play therapist or even someone from day care, personally [*7]confirmed the acting out behavior reported by Mrs. Doe. Based upon hearsay reports from Mrs. Doe, in November a caseworker wrote, "Desiree is extremely active but also very loving and very cute!! She does have several nervous habits and frequent tantrums." The reports of bad behavior led to a decision to have her evaluated, but even the evaluator from Mt. Hope Family Center observed none of the bad behavior, and only observed her briefly (once, perhaps twice). She did not actually work with her. She reported to the clinic from her observations, "Desiree was reluctant to share some play items, tried to take them from a peer, did not want a second child to join in the sand box play, needed verbal reassurance, showed apprehension regarding a rubber spider, and resisted cleaning up." These observations were deemed normal behaviors by the foster care clinic's consulting developmental behavior pediatrician.
The medical file revealed no firsthand report of tantrums and other odd behaviors. The little girl's play therapist saw her weekly but was not seeing the difficult behaviors in therapy, so in March 2006, the therapist recommended reducing the weekly sessions back to biweekly sessions. The foster care clinic doctor and consulting doctor also failed to witness any of the tantrums or other bad or bizarre behaviors in the one time they each saw the child. Still, based on the information from the foster care mother, the consultant recommended Depakote Sprinkles as the fourth option in a treatment plan. On the same days as Dr. Sulkes devised his four-point treatment plan, Dr. Szilagyi, medical director of the foster care clinic, adopted Dr. Sulkes' fourth treatment proposal and prescribed the psychotropic drug. It should be noted that at the same time that psychotropic drugs were being prescribed, the play therapist was cutting back on therapy sessions.

Policies and Procedures for Administration of Psychotropic Drugs Generally and as Applied to Desiree

The exhibits in this case, supported by the testimony, never revealed an actual written procedure with respect to the handling of an objection by a parent to the administration of a particular drug to a child while in foster care.
The written procedure for getting parental consent for surgical or medical procedures to be performed on children in DHS's care and custody was received in evidence. It indicates objecting parents are to be advised that the procedure recommended would take place based on DHS consent, and that the parent is to be advised that he or she may consult an attorney. In the event a petition is pending in a case without parental consent, pursuant to the written procedure, the DHS attorney should be notified for a decision on which the judge and/or law guardian[FN6]

needed to be advised of the situation. If a case is not pending, pursuant to the procedure the DHS attorney should be notified to decide if anyone else needs to be notified. A consent form was introduced, and the testimony was that the form introduced was routinely presented to parents for their signature. Then, if they objected and refused to sign, in two weeks the consent form would be administratively signed so that the treatment sought by DHS could begin.
Caseworker supervisor Ellen Moe testified to the procedures she understood in her role of supervisor over caseworker Black assigned to this L. case, but she had not personally met Desiree. She said the parent is notified and attempts are made to discuss the medication with the parent. If the parent does not give consent and the medication is still believed to be in the child's [*8]best interest, the parent is mailed a letter by certified and regular mail regarding DHS's intent to administer it anyway, giving him or her time to take whatever measures he or she feels are needed. DHS then follows up with regular and certified mail that they have begun the procedure.
Many levels of caseworkers, administrators and supervisors had the authority to sign the form to start medicine over the parent's objection, and if they were not available, any supervising caseworker could sign the override. Furthermore, in the absence of the team supervisor, this authority to sign an override could be exercised by any caseworker acting as a supervisor. This caseworker could be many persons removed from the principals having knowledge of the case. In this case, neither Moe as supervisor nor Ms. Smith, who signed the override, had reviewed the pediatric record or seen the child.
Black was the only representative for DHS who actually informed Desiree's mother and that was by phone. She failed to tell Desiree's mother that if she did not consent, they would start Desiree on the medication anyway; nor did she provide her with information regarding her right to discuss this with her attorney.
Dr. Szilagyi consulted with Dr. Stephen Sulkes[FN7]

on February 14, 2006 about Desiree. Dr. Sulkes recommended (1) behavioral interventions, (2) play therapy, and (3) lead level checks, and suggested (4) a mood stabilizing medicine might help minimize her behavioral outbursts. He testified that Depakote was not FDA approved for mood stabilization for children, but he believed Depakote was so approved for adults and was commonly used on children ages five and up. He said there were risks for long-term effects but most children tolerate it very well. It had been used for over 20 years on children for antiseizure purposes and had been observed to have mood-stabilizing effects. He believed this indicated it is safe to use. Both medical witnesses testified they knew the foster mother was too rigid and felt regulating the child's behavior with medication would be easier and maybe beneficial for Desiree rather than moving her to yet another foster home.
Dr. Szilagyi testified the decision was made on February 14, 2006, the day Dr. Sulkes saw Desiree, that Depakote Sprinkles (also known as valproate) should be prescribed. That same day, Dr. Szilagyi, as the physician recommending treatment, signed the form used by the clinic to refer the case to the Department for parental or administrative consent to administer the prescribed medication. The letter sent to Desiree's mother advising her of this decision was dated almost two weeks later, on February 27, 2006. It said in part, "If you do not return the signed consent, the Administrative Caseworker will sign and she will be administered the medication beginning on March 3, 2006." Senior caseworker Smith signed for DHS, in place of a parent or legal guardian, on March 3, 2006. The medication was reportedly started on or shortly after March 3, 2006, as stated in the letter.
The testimony is uncontested that this decision to administer Depakote Sprinkles was made without discussion of the merits of the mother's objections, without an administrative review procedure involving going to a higher authority, not previously directly involved, and without notice to, or an application to, a court for permission to administer the drugs over the [*9]mother's objection.[FN8]

From all of this, the court concludes that Desiree, initially an average two year old, began to decompose within the foster care environment as she dealt with her separation from her mother, her lack of access to her brother, and the four foster homes in five months. It appears she was physically abused in two of the foster homes and clearly emotionally deprived of patience and understanding in the Doe foster home. She acted out by biting, hitting and crying every day and most every night. Ms. Doe was not able to address the needs of a child exhibiting the severe separation anxiety this three year old showed, and the system's answer was to medicate her to modify her behavior.
Dr. Sulkes testified that there are commonly-used evaluative tools for three year olds but he did not use them on Desiree. Behavior modification for Desiree, a less intrusive recommendation from Dr. Sulkes, was ignored. Instead, Dr. Szilagyi prescribed Depakote Sprinkles for three-year-old Desiree, Dr. Sulkes' last alternative recommendation, despite a lot of unanswered questions regarding Depakote and young children, despite known dangerous side effects, and despite anticipated imminent return of the child to her objecting mother. According to Dr. Szilagyi, this was a drug used for the past five to seven years as a psychotropic agent. Dr. Szilagyi acknowledged that most of what is known about Depakote biochemically comes from animal studies, not humans, and even with human studies, most are done on older children. She conceded that there was very little scientific work done on three year olds, and she could not name any studies. She explained the drug was used for seizure control and obviously has some impact on the brain, saying "[t]here is always a potential for anything we do in medicine that is going to have a long term impact and it is always a concern in the developing brain of a young child."
Dr. Szilagyi explained that they never start the psychotropic medication without assessing liver and bone marrow function first, and that Depakote Sprinkles is a medication that starts at a low dose and is gradually increased to get it to a "therapeutic level." She looks for a clinical response, while monitoring blood levels and rechecking bone marrow and liver functions every two weeks. When asked, "In checking blood levels and the effect on the liver, does this in any way monitor the impact on the child's brain?" she replied, "No." For side effects, she listed sedation and stomachaches as common, and stated the rarer ones included impact on liver, bone marrow, pancreas and even death. She also acknowledged drowsiness, dizziness, restlessness, irritability, diarrhea, tremor, hair loss, unusual bleeding or bruising, rash or hives with itching, and allergies as side effects.
The foster care clinic and DHS acted without considering the merits of the mother's objection, without giving her a reasonable time to consult a lawyer, and using as authority a law which says nothing about mental health medications. The law, according to its legislative history (discussed below), appears to have been enacted to provide a means for giving uncontroversial, immediately necessary care to foster care children—not intrusive and potentially damaging mental health drugs which may or may not work and which would be objectionable to many reasonable parents.

The Legislative History of Social Services Law § 383-b
[*10]
Section 383-b was enacted in 1972 and amended three times, in 1973, 1974 and 1986. The law initially provided medical treatment for abused children, and said, "The local commissioner of social services or the commissioner of health may give effective consent for medical, dental, health and hospital services for any abused child under the age of sixteen years." With the amendments, it was expanded to cover neglected as well as abused children, without regard to age, and in custody of the Commissioner in any manner. The wording of the services provided never changed. The New York State Department of Health indicated that before this law, parental consent, an emergency, or a court order were needed in order to provide such services.
Never in the legislative history as contained in the Bill Jackets was there any mention of mental health treatment or mental health drugs, let alone psychotropic drugs for young children. Instead, the point of the initial legislation was to provide "immediate," "prompt," "necessary" "medical, dental, health and hospital services" "without delay." Much of the legislative history emphasized the need for such authority due to dangerous threats to a child's life and the inability to reach parents. Safeguarding the health and well-being of children, acting in their best interest, and avoiding permanent injury were themes throughout the Bill Jacket. The general understanding reflected was that the authority would not often be needed and that it would be helpful in "certain situations." Some of the comments indicated the statute would serve as a "temporary measure" allowing necessary, immediate treatment. Only occasionally was there a mention of parents' rights in any respect. Never in the legislative history was the constitutionality of this legislation raised.
However, the New York State Department of Social Services, regarding the final 1986 amendment, noted arguments against the bill which are generally relevant in the case at bar, saying:
"This bill does not consider the right of natural parents to make decisions concerning medical treatment to be administered to children over whom they retain legal guardianship. The bill authorizes a local commissioner to provide medical treatment to any child temporarily placed in its care without having to demonstrate that such medical care is necessary to treat a life threatening condition and without having to obtain the consent of the natural parent. The bill does not provide any notification to natural parents of the medical treatment authorized by a local commissioner on their children's behalf and does not provide for parental objection to proposed medical treatment to be weighed against the commissioner's finding that certain medical treatment is necessary and appropriate.
"This bill would authorize a commissioner to give effective consent for any medical, dental, health and hospital services, irrespective of the need for such services, and it does not set any standards or place any limitations on the type or extent of medical, dental, health and hospital services that can be authorized." (Letter from State Dept of Social Servs to Evan A. Davis, Counsel to Governor, July 17, 1986, Bill Jacket, L 1986, ch 570, at 12-13 [emphasis added].)
DHS in the case at bar adopts the position that it can do what it wants with children in its care, without regard to medical necessity, standards, limitations, or parental objections. In essence, it seeks to be the nonreviewable arbiter of every part of a child's health care needs so long as that child is in its custody. However, this court concludes that the legislation as adopted was not intended to authorize every medical decision which might be made with respect to any child.

Legal Discussion

A decision as to whether the Department had the lawful authority to administer Depakote Sprinkles to Desiree over her mother's objection is aided by the purpose of the statute relied upon as expressed in its legislative history and by the merger of the principles of Rivers v Katz (67 NY2d 485 [1986], supra) with those in Santosky v Kramer (455 US 745 [1982], supra). Rivers ruled that the forcible administration of antipsychotic drugs to adult patients involuntarily hospitalized in a psychiatric center was not always allowed. Santosky, appealed from New York's Third [*11]Department, established that "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." (Id. at 753.) In applying due process principles to termination of parental rights cases, Santosky (at 753) acknowledged the United States Supreme Court's historic recognition of the fundamental liberty interest inherent in family life, saying:
"[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment. Quilloin v. Walcott, 434 U. S. 246, 255 (1978); Smith v. Organization of Foster Families For Equality & Reform, 431 U. S. 816, 845 (1977); Moore v. East Cleveland, 431 U. S. 494, 499 (1977) (plurality opinion); Cleveland Bd. of Ed. v. LaFleur, 414 U. S. 632, 639-640 (1974); Stanley v. Illinois, 405 U. S. 645, 651-652 (1972); Prince v. Massachusetts, 321 U. S. 158, 166 (1944); Pierce v. Society of Sisters, 268 U. S. 510, 534-535 (1925); Meyer v. Nebraska, 262 U. S. 390, 399 (1923)."
While a case regarding medical treatment of a child, over a parent's objection, in a non-life-threatening mental health situation, has not been found, M.N. v Southern Baptist Hosp. of Fla., Inc. (648 So 2d 769 [Fla Dist Ct App 1994]), involving the preservation of a child's life, is helpful. It states (at 770-771):
"Ordinarily, decisions regarding the care and upbringing of minor children will be left to the parents. This parent-child relationship is a fundamental liberty interest which is constitutionally protected. Padgett v. Department of Health and Rehabilitative Services, 577 So.2d 565 (Fla.1991); In Re R.W., 495 So.2d 133 (Fla.1986); see In Re Dubreuil, 629 So.2d 819, 827 n. 11 (Fla.1993). But the parents' rights are not absolute, as the state has parens patriae authority to ensure that children receive reasonable medical treatment which is necessary for the preservation of life. J.V. v. State, 516 So.2d 1133 (Fla. 1st DCA 1987). . . .
"The state may override the fundamental liberty interest in the parent-child relationship only when there is a sufficiently compelling state interest. In Re Guardianship of Browning, 568 So.2d 4 (Fla.1990); Dubreuil [supra]. Furthermore, the state's action must be narrowly tailored so as to produce the least intrusive interference with individual rights, although the preservation of life has been described as the most significant state interest. Browning [supra]. As with the parent-child relationship, the state's parens patriae authority is thus not entirely unfettered. Rather, the state's interest [to preserve life] diminishes as the severity of an affliction and the likelihood of death increase . . . .
"On the other hand, the parents' wishes may be overcome when there is sufficient medical evidence to invoke the state's parens patriae authority, and to establish that the child's welfare will be best served by the disputed treatment. See, e.g., In Re Cabrera, 381 Pa.Super. 100, 552 A.2d 1114 (1989); In Re Wilmann, 24 Ohio App.3d 191, 493 N.E.2d 1380 (1986); In Re Hamilton, 657 S.W.2d 425 (Tenn.App.1983); Custody of a Minor, 375 Mass. 733, 379 N.E.2d 1053 (1978)." (Emphasis added.)
In M.N. (supra) the State was asked to require chemotherapy and blood transfusions for a severely ill eight-month-old baby whose life could only be expected to be briefly extended by the treatments. The State's interest was found to be too weak to override the parents' objections.
Rivers v Katz (supra) is the seminal New York case explaining an adult's due process [*12]rights to oppose medication.[FN9]

The Court of Appeals (at 492) noted therein, "[i]t is a firmly established principle of the common law of New York that every individual 'of adult years and sound mind has a right to determine what shall be done with his own body' . . . and to control the course of his medical treatment," even to refuse medical treatment which might be beneficial or lifesaving. The Court stated the right extends equally to mentally ill persons, who have no lesser status or dignity because of their illness, and ruled that the fact of their mental illness did not require a conclusion that they could not comprehend the consequences of a decision such as to refuse medication. In short, the Court ruled that simply disagreeing with a psychiatrist's judgment about the benefit of medication outweighing the detriment did not make the patient's decision incompetent. Similarly, this court concludes that a parent's judgment about the benefit versus the detriment of medicating a child is not incompetent just because the parent disagrees with a doctor and the parent's child is placed in foster care because of the parent's neglect and abuse.
The Rivers court held that mentally ill adults' rights to reject treatment with antipsychotic medication is not absolute and under certain circumstances might have to yield to compelling state interests. Similarly, a parent's right to object to medication for a child might have to yield to compelling state interests. Two kinds of compelling state interests were identified in Rivers and could be applicable in cases involving medicating children. First, the state's police power could be used where the patient presented a danger to himself or others, or engages in dangerous or potentially destructive conduct while institutionalized. Second, the state's parens patriae interest could justify a forcible administration of antipsychotic drugs if the patient lacked the capacity to decide whether to personally take the drugs. Thus, the Rivers court concluded there must be a judicial determination of whether the adult patient has the capacity to make a reasoned decision with respect to the proposed treatment before the parens patriae power can justify administering the drugs. That would require (1) a de novo hearing, (2) with counsel, and (3) clear and convincing evidence of the patient's incapacity to make a treatment decision. If the adult patient is competent to make the decision, the state may not administer the drugs over his objection.
If, however, the patient is not competent to make the decision, the parens patriae power applies. Rivers said the court then must determine whether the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest, taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments. Again, the state would bear the burden of proving by clear and convincing evidence that the proposed treatment meets the stated criteria. Any administrative review process must sufficiently protect these due process rights of involuntarily-committed patients.[FN10]

The DHS Administrative Procedure Was Not Constitutionally Valid

The current administrative consent process used by DHS violates the due process rights of parents because it gives them no real rights—only the opportunity to consent. It is more like a notice provision regarding a decision already made than an invitation to participate in the decision-making process. The administrative consent process used also impinges unacceptably on the rights of children and exceeds the constitutional power of the Legislature itself and the purpose of the legislation relied upon as authority for the administrative consent process. As set forth in the legislative history discussed above, the purpose of section 383-b was to provide for immediately necessary medical, dental, health and hospital treatment when no parent was available to consent. The fear that Social Services Law § 383-b could lead to unbridled usurpation of normal parental judgment and authority is realized with the current DHS practice/policy. (Cf. Newmark v Williams, 588 A2d 1108, 1120 [Del Sup Ct 1991] [holding, "Parents must have the right at some point to reject medical treatment for their child," and noting, "Courts have consistently authorized state intervention when parents object to only minimally intrusive treatment which poses little or no risk to a child's health"].)
Of course, a three-year-old child by definition is incompetent to make his or her own medical decisions, and even though a parent has lost the care and custody of his or her children due to neglect, he or she still retains his or her constitutional right (i.e., liberty interest) to the management of important medical decisions for those children. The parental competence of Desiree's mother is not an issue here, as it must be concluded that the parens patriae power of the State would always exist with respect to young children in the State's care, as they would always be deemed incompetent to make their own medical decisions. In cases where a parent objects, the decisive question must be whether the medication should be administered to the child under the parens patriae power.
The standard to be applied under the parens patriae power to a child's mental health medication determination, over parental objection, should be virtually lifted from Rivers. Thus, this court holds that, if the parent of a child in foster care opposes the administration of mental health medicine, it cannot lawfully be prescribed unless the court determines, after a hearing de novo with counsel, whether the proposed treatment by medication is narrowly tailored to give substantive effect to the child patient's liberty interest, "taking into consideration all relevant circumstances, including the [child] patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments." (Rivers, supra at 497-498 [emphasis added].) Of course, the court must consider the credibility of all evidence, including the evidence forming the basis of the medical doctor's decision. The broad language of section 383-b cannot override a parent's—or a child's—constitutional rights.
This court further concludes that DHS must bear the burden to establish, by clear and convincing evidence, that a proposed medication meets these criteria when a parent objects. As noted in Santosky (supra), the degree of proof required in a particular type of proceeding "is the kind of question which has traditionally been left to the judiciary to resolve." (455 US at 755-756, quoting Woodby v INS, 385 US 276, 284 [1966].) A logical extension of Rivers would indicate that clear and convincing evidence is needed to override a parental objection to a proposed medication for that parent's young child. (Accord Newmark v Williams, 588 A2d 1108 [1991], supra.)

Social Services Law § 383-b Does Not Apply to These Facts

As set forth in the legislative history discussed above, the purpose of Social Services Law § 383-b was to provide for immediately necessary medical, dental, health and hospital treatment when no parent was available to consent. There is no basis for believing the statute was intended to authorize the administration of a psychotropic medication for a child when a [*13]parent was not available or would not consent. Section 92 (a) of McKinney's Consolidated Laws of New York, Book 1, Statutes provides, "The primary consideration of the courts in the construction of statutes is to ascertain and give effect to the intention of the Legislature." Thus, the Department inappropriately relies on the broadly drafted statute. Such a use of the statute would make it unconstitutional as applied, i.e., it would violate respondent's fundamental liberty interest inherent in family life. As provided by section 150 (c) of McKinney's Consolidated Laws of New York, Book 1, Statutes, "[i]f possible, a statute is required to be construed in favor of its constitutionality, and in such manner as to uphold its constitutionality." The fear noted in the legislative history that this law could lead to unbridled usurpation of normal parental judgment and authority is in fact realized with the current DHS practice/policy as applied in this case.
Section 383-b of the Social Services Law will not be held to authorize DHS to override respondent's refusal to consent to the nonemergency administration of psychotropic drugs to her child without a court order to see if it "might" help. That would be an extremely intrusive action which the legislation was not intended to cover. Thus, the Department inappropriately relies upon the broadly written statute for authority.

Conclusion

The administrative override procedure used by the Department to negate Desiree's mother's objection to Depakote Sprinkles was routine, rote and without adequate review procedures. It was not authorized by statute, was lawfully ineffective and was an unconstitutional usurpation of fundamental parental authority in this matter. Respondent's due process rights and the fundamental liberty interests of both parent and child were ignored. Every child is too precious to be treated in such an offhand, impersonal manner, with so little weight given to possible negative consequences, and without any impartial oversight by persons not involved with making the decision to medicate.
Section 383-b of the Social Services Law was not intended to authorize the nonemergency use of psychotropic drugs on children over parental objection. Desiree's mother's refusal to consent should have been honored.
Had the Department initially sought a court order for authority to administer Depakote Sprinkles when the mother objected, the court would have weighed the evidence, examined the merits of the parent's objection, and considered the State's parens patriae interest in the Department's request to override the mother's objection. This would have resulted in a duly appealable determination as to whether the request for administration of the drug should be granted, all after a full hearing with the right to counsel.[FN11]

[*14]
Now, therefore, for the reasons set forth above, it is ordered that this court's preliminary order to vacate the Department of Human Services' determination to medicate Desiree with Depakote Sprinkles (also known as valproate and valproic acid) is confirmed, and DHS may not administer any antipsychotic drug to Desiree on a nonemergency basis over the objection of the respondent mother without a further order of a court of competent jurisdiction.

Footnotes

Footnote 1: Emergency foster care is counted as her first foster home throughout this decision.

Footnote 2: The records indicate various dates for the removal, April 5, 2005 per foster care clinic, April 7, 2005 per DHS psychosocial summary, April 12, 2005 per County Attorney's legal argument, April 20, 2005 according to another DHS record. The first court appearance was April 12, 2005.

Footnote 3: Based on this testimony by the county's witness, Dr. Moira Szilagyi, the court specifically asked the County Attorney's Office to investigate the existence of the federal authority mentioned by Dr. Szilagyi. The office reported back that it knew of none.

Footnote 4: The medical authorization form states in its most relevant parts,
"I/We hereby grant my/our permission to the Monroe County Department of Human Services and the Monroe County Department of Public Health, and/or any other health care provider approved by the Monroe County Department of Human Services, on behalf of my/our child Desiree L., . . . to provide and/or obtain any necessary . . . referrals, evaluations, consultations and/or treatment for identified behavioral and emotional problems (this does not include the prescription of medication for these issues, which requires a separate consent).
"I/We understand that my/our child would receive appropriate medical care in emergent or life threatening situations.
"I/We understand that this authorization does not include any medical or surgical procedures for which separate informed consent is required." (Signed by D.L., Apr. 14, 2006, and witnessed.)

Footnote 5: This decision also does not reach the validity of existing DHS procedures with respect to the obtaining of consent for the administration of prescription or nonprescription drugs to treat medical, as opposed to mental health, problems. Nor does it reach the validity of existing DHS procedures with respect to the obtaining of consent for performing medical procedures, such as setting broken bones, suturing cuts, or performing surgery.

Footnote 6: The law guardian is the attorney assigned to represent the interests of the child.

Footnote 7: Dr. Sulkes is a developmental pediatrician at the Strong Center for Developmental Disabilities of Golisano's Children's Hospital at Strong Memorial Hospital.

Footnote 8: The matter is before the court as part of a permanency planning report filed as required on March 28, 2006. The hearing date of May 31, 2006 was advanced because of this issue.

Footnote 9: Accord Matter of Michael L., 26 AD3d 381 (2d Dept 2006); Matter of McConnell, 147 AD2d 881 (3d Dept 1989).

Footnote 10: In Rivers there were official written administrative review procedures, at 14 NYCRR 27.8, but the Court found them insufficient to protect the due process rights of involuntarily-committed patients (NY Const, art I, § 6).

Footnote 11: A child's medications should not be decided by legal strategy or technical shortcomings. Because the court has before it a complete record with respect to the propriety of Desiree taking Depakote Sprinkles, this court will briefly address whether or not there was a basis for administering this medication to Desiree over her mother's objection. If DHS had asked for a court order to administer Depakote Sprinkles, this court, based on the extensive evidence before it, would have denied that order. The decisive question would have been whether the parens patriae power justifies overriding Ms. L.'s objection to the administration of Depakote Sprinkles to her three-year-old daughter.
Weighing in favor of giving Desiree Depakote Sprinkles is the possibility that the medication might improve her life by stabilizing her moods and minimizing her behavioral outbursts.
Weighing against administering the drug are the relatively long time the medicine takes to go into effect, if it ever will, and the plan to return the child to her objecting parent in the very near future. Considering Desiree's behavior prior to foster care, and her attachment to her mother, a return might significantly reduce the child's defiant and difficult behaviors more quickly and effectively than Depakote Sprinkles, with no side effects. The serious known side effects, including the possibility of permanent effects on the brain, weigh strongly against its use on a three year old with a developing brain. Further, there was no evidence that the child's day-care provider encountered problems to the same extent as the foster care mother reported. The fact that the desire for use of the medicine comes from a description of behavior given almost entirely by a foster care mother who is known to be somewhat rigid, raises the possibility that the day-care provider can handle Desiree better than the foster care mother can, or that the bad behavior is related to the time of day, or to the return to the foster care mother's care. The fact that behavior modification was a preferred, no side effect treatment, but was not used because the particular foster mother was not interested in trying it, also weighs heavily against use of the drug.
The decision to medicate this child was based on hearsay, limited information, and without any complete evaluation of an existing mental health issue by a psychiatrist or psychologist. DHS did not establish clear and convincing evidence that Depakote Sprinkles meet the Rivers criteria if applied here, or that it is in Desiree's best interests to take Depakote Sprinkles. The benefits to be gained are "iffy" at best. The adverse side effects are potentially permanent and extraordinary. Behavior modification through therapy should have been attempted. The prescription for this "trial" medication was not narrowly tailored to give substantive effect to Desiree's or her mother's liberty interest, but was proposed to see if it would modify Desiree's behavior. The foster care clinic approach was let's at least try it and see if it works before the mom gets a chance to be in control of her child—i.e., we are willing to take the risk with her child at this time, even if she is not. DHS echoed that position.
The DHS determination interfered more than constitutionally permissible with the mother's parental rights, while placing the child's well-being unnecessarily at risk and thus interfering more than constitutionally permissible with her rights. This was particularly true since Dr. Sulkes was unaware that Desiree might be returned soon to her mother and this fact might have changed his medication recommendation. Indeed, the prescription put the interests of the temporary foster mother over those of the biological mother, with the risk being placed squarely on the three year old. Certainly, a reasonable parent could say "no" to the psychotropic drug under the facts presented. Therefore, the facts of this case did not support the application of the parens patriae power to override the mother's reasonable objection to Depakote Sprinkles being given to her daughter.